[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 16, 2008
THOMAS K. KAHN
CLERK

_____

No.  06-13847

_____

D.C. Docket No.  05-00206–CR-006-WHS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CALVIN WESTRY,
a.k.a. Snap,
MACK DAVID WOODYARD,
WILLIE MERER HINTON,
a.k.a. Chill,
a.k.a. Chill Will,
WILLIE EARL CARTER JR.,
a.k.a. Bip,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

**(April 16, 2008)**

Before EDMONDSON, Chief Judge, WILSON, Circuit Judge, and ALTONAGA,[*] District Judge.

PER CURIAM:

On February 24, 2006, a federal grand jury in the Southern District of Alabama returned a Second Superseding Indictment charging Defendants, Calvin Westry ("Westry"), Mack David Woodyard ("Woodyard"), Willie Merer Hinton ("Hinton"), and Willie Earl Carter, Jr. ("Carter"), in Count One, with conspiring with each other and other named Defendants[1] from March 1998 to June 30, 2005, to possess with intent to distribute Schedule I, II and III controlled substances, to-wit: morphine; Oxycodone, commonly known as oxycontin; Hydrocodone, commonly known as lortab; Hydromorphine, commonly known as dilaudid; Methadone; and more than 50 grams of a mixture and substance containing a detectable amount of cocaine base, commonly known as crack cocaine, in violation of 21 U.S.C. §§ 841 and 846. The amount of crack cocaine was alleged to exceed 50 grams, thereby subjecting Defendants to the penalty provision of 21

---

[*]Honorable Cecilia M. Altonaga, United States District Judge for the Southern District of Florida, sitting by designation.

[1] The other Defendants were Rose Mary Westry, Leonard Edward Westry, Jr., Ashir Abdullah Ibin Zuniga, Cynthia Denice Young, Christina Marie Hogue, Kingston Bodacious Osborne, and Edward Kenneth Riley. With the exception of Osborne, all other Defendants pled guilty before trial, and several testified for the government at the trial pursuant to written plea agreements.

U.S.C. § 841(b)(1)(A). Count One also alleged the offense occurred within 1,000 feet of a school, subjecting Defendants to the penalty provisions of 21 U.S.C. §§ 841(b)(1)(A) and 860(a) and (b). Furthermore, the enhanced penalty provision of 21 U.S.C. § 841(b)(1)(A) was alleged to apply, because the November 27, 2001 death of Jasen Johns ("Johns") resulted from the use of controlled substances distributed during the conspiracy.

Defendants were also charged with substantive offenses of possession with the intent to distribute in violation of 21 U.S.C. §§ 860 and 841(a)(1), and 18 U.S.C. § 2. Westry was charged in Counts Eleven (Oxycodone) and Twelve (Hydrocodone) with offenses committed on November 18, 2002; and in Counts Thirty-One (Oxycodone) and Thirty-Two (Hydrocodone) with offenses committed on June 30, 2005. Woodyard was charged in Counts Four (Oxycodone) and Five (Oxycodone) with offenses committed on October 11, 2002 and October 12, 2002, respectively. Hinton was charged in Count Ten (Oxycodone) with an offense committed on November 16, 2002. Carter was charged in Count Fifteen (Morphine) with an offense committed on February 18, 2003, and Count Twenty-Four (crack cocaine) with an offense committed on January 6, 2005. All counts, except Counts Ten, Eleven and Twelve, were alleged to have occurred within 1,000 feet of a school, subjecting those Defendants to the penalty provisions of 21

3

U.S.C. §§ 841(b)(1)(A), (B), (C) and (D), and 860(a) and (b).  Counts Ten through Twelve were alleged to have occurred within 1,000 feet of a public housing facility, subjecting those Defendants to the penalty provisions of 21 U.S.C. §§ 841(b)(1)(A), (B), (C), and (D), and 860(a) and (b).

Defendants appeal their convictions and sentences on Count One, following a jury trial that commenced on March 6, 2006 and concluded on March 16, 2006. As to Count One, the jury found that the amount of crack cocaine involved in the conspiracy exceeded 50 grams, as charged; the Defendants were all members of the conspiracy the day Jasen Johns died; and Johns' death resulted from the use of the controlled substances Defendants conspired to possess with the intent to distribute.  Westry also appeals his convictions and sentences on Counts Eleven and Twelve, within 1,000 feet of a public housing facility; Woodyard appeals his convictions and sentences on Counts Four and Five within 1,000 feet of a school; Hinton appeals his conviction and sentence on Count Ten within 1,000 feet of a public housing facility; and Carter appeals his convictions and sentences on Count Fifteen (within 1,000 feet of a school) and Count Twenty-Four.[2]  The appeal raises issues concerning the sufficiency of the evidence, error in evidentiary rulings,

[2] Westry was found not guilty of the offenses charged in Counts Thirty-One and Thirty-Two.  The only other Defendant to proceed to trial with Appellants was Kingston Bodacious Osborne, who was found not guilty of all offenses for which he was charged.

4

error in the refusal to give requested jury instructions, and several sentencing errors, some of which the government concedes, as is further explained below. After careful review, we affirm in part and vacate in part, and remand this case to the district court for further proceedings consistent with this opinion.

## I. **BACKGROUND**

Most of the events in question occurred in and around 406 Clay Street (the "Clay Street home"), the home of Lucious "Mama" Westry ("Lucious"),[3] two nearby homes at 456 and 459 Maple Street, and an apartment at the Boykin Towers public housing project. Between March 18, 1998 and June 30, 2005, seven search warrants were executed at the Clay Street home, and several search warrants were also executed at the nearby residences, from which controlled substances, drug paraphernalia, and firearms were recovered. The story that emerges from the testimony and evidence is that of a matriarch, with several younger generations, occupying a home at which vehicles would approach, one after another; a home from which females would walk out to waiting cars, spend ten to fifteen seconds, and walk back into the yard. The story, in other words, consists of activities which viewed together are indicative of repeated drug

---

[3] After being named in the first Indictment filed on June 24, 2005, and while detained in a Bureau of Prisons medical facility awaiting trial, Lucious Westry died at the age of 91.

transactions. Following the execution of federal search warrants on June 30, 2005, the drug dealing activities at the Clay Street home, the related nearby homes on Maple Street, and the Boykin Towers apartment came to an end.

*406 Clay Street*

Local law enforcement made several attempts over the years to stop the activities observed in and around the Clay Street home. On March 18, 1998, the Mobile Police Department ("MPD") executed a search warrant at the Clay Street home, and recovered crack cocaine, nine prescription pill bottles, assorted pills including valium and morphine, and drug paraphernalia. Several months later, following a controlled buy of morphine by a confidential informant at the Clay Street home, an MPD Officer executed a search warrant on October 1, 1998, and found a "plethora of pills" in a zippered bag in Lucious' bosom. Morphine pills, assorted paraphernalia, a pistol and crack cocaine were also found inside the home. Present during the second search were several Co-Defendants, but not Appellants.

The MPD returned to the Clay Street home on December 29, 1999, to execute yet another warrant in search of prescription drugs. This time Westry was present. The officers found four unknown pills and several bottles of lortab and valium prescribed for Westry and Lucious.

On May 22, 2001, the Mobile County Sheriff's Office ("MCSO") returned to the Clay Street home to execute a search warrant following a controlled buy. Officers found two small baggies (one containing miscellaneous pills, one containing two small rocks), a glass pipe thrown out beside a bathroom window, a bag containing a pill bottle, U.S. currency, prescription bottles, glass smoking devices, and other miscellaneous pill bottles with assorted pills. The MCSO participated in another search at the Clay Street home on August 5, 2002. Money and pills were recovered, and Lucious was arrested.

On September 27, 2002, MPD Narcotics Officer Patrick McKean made his first of several undercover drug purchases at the Clay Street home, wearing a concealed microphone and street clothes. Many of the ensuing drug transactions were captured on audiotape and were played to the jury.[4] He purchased two oxycontin pills from Defendant, Rose Westry ("Rose"), and returned approximately four hours later to purchase two more oxycontin pills from her. The following night, on September 28, 2002, Officer McKean returned to the Clay Street home and bought four oxycontin pills from Shannon Jones ("Jones"), Lucious' granddaughter, and a key witness for the government at trial. During

---

[4] Some of the undercover buys were recorded by use of a pole camera installed to record the activities at the Clay Street home. The pole camera was in operation from September 27, 2002 to February 13, 2003.

7

that drug transaction, Leonard Westry ("Leonard") was present. Two days later, on September 30, 2002, Officer McKean returned, buying two oxycontin pills from Rose. Again, on October 7, 2002, Officer McKean returned, buying three morphine tablets from Rose.

On October 8, 2002, Officer McKean bought drugs from Jones, first at the Clay Street home and, after taking her in his car "around the block" to the 456 Maple Street home, he obtained more pills retrieved from that house.

On the night of October 11, 2002, Officer McKean made an undercover buy from Woodyard, who flagged down the officer as he cruised through the neighborhood in his vehicle, after the officer had not found anyone at the Clay Street home. Woodyard offered to sell, and later Officer McKean purchased two oxycontin pills from Woodyard. During the transaction Woodyard yelled back at the Clay Street home to see if they had anything and was observed by McKean walking toward that house.

Woodyard again flagged down Officer McKean on October 12, 2002, asking the officer if he had "been served." When Officer McKean responded that no one was down there, Woodyard told the officer to "hit the block" and "come back in a minute." When the officer returned, he saw Woodyard coming out of the

8

front yard of the Clay Street home, and Woodyard told the officer he had two oxycontin pills.

Officer McKean purchased three dilaudid pills from Rose on October 16, 2002 at the Clay Street home after she informed him she was out of oxycontin. He bought four methadone pills and one morphine pill from Jones after picking her up at the Clay Street home on October 22, 2002. After the sale, Woodyard stopped the officer and asked him "if they took care of [him] or if [he] got served." The officer responded that Shannon had taken care of him. Woodyard told the officer to return before nine, that Woodyard would be standing right there, and that the cost would be $30 apiece.

On November 13, 2002, Officer McKean made contact with Rose outside the Clay Street home, was told to "make the block," and upon his subsequent return, purchased two oxycontin tablets and crack cocaine. He observed her coming and going from the yard at the Clay Street home. The next day, November 14, Officer McKean purchased an oxycontin pill from Jones and two oxycontin pills from Rose. Rose was also able to obtain crack cocaine from Defendant, Ashir Zuniga ("Zuniga"), who was also in the yard. Zuniga was married to Defendant, Christina Marie Hogue ("Hogue"), and the latter also testified for the government at trial, following a written plea agreement with the government.

9

Officer McKean returned on November 18, 2002, purchasing one oxycontin pill from Rose. Rose refused to discount the purchase price, as suggested by the officer, to cover reimbursement for a prior deal where the officer had overpaid her, indicating the drugs were not hers to discount. Rose, as well as Jones, would obtain drugs from others to sell to Officer McKean whenever the women did not have them to sell. Officer McKean also bought oxycontin tablets from Rose on November 22 at the Clay Street home.

MCSO Deputy Jason Powers went to the Clay Street home, including conducting drive-by surveillance, approximately eight to ten times. Every time he rode by, he observed one or more persons on the porch or in front of the residence; he would see females walking to the vehicles, spend maybe 10 to 15 seconds, turn around and walk back into the yard. In his role assisting with the pole camera, on November 22, 2002, Deputy Powers reported that a white male was observed leaving the Clay Street home. When approached by Deputy Powers, the subject threw down a matchbox containing a morphine pill.

Officer McKean made another undercover buy from Jones on December 13, 2002 at the Clay Street home. The same day, Princeton Westry and Tammy Perryman were arrested following participation by a confidential informant, who indicated Princeton Westry was associated with the Clay Street residence.

On January 10, 2003, Officer McKean, accompanied by an informant, planned to buy drugs from Lucious inside the Clay Street home. Before he could enter, he was approached by Woodyard, who had two morphine tablets. Officer McKean requested four pills, and after receiving payment, Woodyard entered the Clay Street home and shortly thereafter returned with the other two pills.

In April 2005, an MPD officer made undercover drug buys from the Clay Street home, capturing the transactions on video camera. The officer bought oxycontin from Defendant, Samuel Beckham ("Beckham"), at the Clay Street home on April 14, 20, and 25, 2005. Beckham, too, testified at the trial for the government.

MPD Corporal Joseph Wolfe was assigned to the Street Level Interdiction and Drug Enforcement detail in 1999 as a Task Force Officer, and went to the Clay Street home, one of the MPD "hot spots," nearly every day on drug-related calls. Beginning September 2002, Wolfe became personally involved in an investigation of the Clay Street home, "in an attempt to curtail the drug activity that was going on there." Using confidential informants and undercover police officers, 23 undercover buys took place at the Clay Street home and the Boykin Towers apartment.

In October 2003, following execution of a search warrant, arrests on state charges,[5] and renewed drug activity after "the individuals hit the streets again," the U.S. Drug Enforcement Administration ("DEA") was contacted and opened an investigation. Officer Wolfe was assigned to the DEA as a Task Force Officer. The DEA orchestrated a series of undercover buys from December 2004 to April 2005. In June 2005, following more undercover transactions, law enforcement returned to the Clay Street home, executing search warrants and federal arrest warrants. Drug evidence, including hydrocodone, oxycodone and drug paraphernalia were recovered. Police also recovered a loaded Rossi .38 caliber revolver that had been reported stolen.

*456 and 459 Maple Street*

In addition to the activities noted in or around the 406 Clay Street home, transactions occurred at the nearby home located at 456 Maple Street. On August 28, 1998, the Mobile County Sheriff's Office executed a search warrant at the residence of Co-Defendant, Edward Kenneth Riley ("Riley"), located at 456 Maple Street (1½ blocks from the Clay Street home), where 550 pills and numerous prescription bottles were recovered.

---

[5] Among the people arrested were Lucious Westry, Kim Westry, Willie Carter, Rose Westry, and Pauline Westry.

12

In early 2002, the MPD utilized a confidential informant to buy cocaine powder from Lucious' brother, "Lawyer Charlie," at 459 Maple Street. Thereafter, on February 28, 2002, a search warrant was executed at that address and officers recovered cocaine, morphine, oxycontin pills and, in the place where Lawyer Charlie was sitting, crack cocaine.

On October 8, 2002, Jones took Officer McKean from the Clay Street home to 456 Maple Street to get morphine. Officer McKean and others used an informant to place a call to Defendant Carter on February 18, 2003. The informant purchased morphine from Carter later in the day after they both went first to 459 Maple to obtain the pills.

*Boykin Towers Apartment*

Appellant, Calvin Westry's apartment was located at 1600 Michigan Avenue, in the public housing project known as Boykin Towers. Confidential informant, Sunny Foxx ("Foxx"), had been arrested for buying drugs at the Clay Street home and cooperated. Foxx set up a drug deal for Officer McKean with Westry, known as "Snap," in a recorded telephone conversation that occurred on November 16, 2002. In the conversation, Westry mentioned that Appellant Hinton would need to be paid for gas as he would be driving to get the pills. When Officer McKean and the confidential informant arrived at the Westry apartment,

13

Hinton was introduced to them as "Chill." The officer gave the money for the pills to Westry, and paid Hinton $5 for the gasoline. Hinton is heard on the audiotape asking if the officer knew of any good heroin out there.

Officer McKean had telephone conversations with Westry several times, trying to arrange another meeting in order to purchase more oxycontin pills. The officer also spoke to Chill, or Hinton. The officer returned to Boykin Towers on November 18, 2002 and purchased oxycontin and lortabs, after Westry's daughter, Kim Westry, arranged to meet "Fly" and returned with the pills.

*Jasen Johns' Death at the Clay Street Home*

The parties stipulated that the cause of Jasen Johns' death was a combination of methadone and cocaine. Before his death, from on or about 1997-98, Johns and his first cousin, Michael James Carpenter ("Carpenter"), would go "every other day, every day" to the Westry house on Clay Street to purchase drugs, including morphine, oxycontin, and methadone. On November 26, 2001, Carpenter and Johns injected methadone into their arms in a back room of the Clay Street residence. Carpenter then went to Calvin Westry's apartment at Boykin Towers to spend the night. Johns stayed behind, waiting on Defendant Carter, also known as "Bip," to come with some cocaine. When Carpenter left, Carter had already arrived and Carter and Johns went to the back of the residence.

14

Julius Sayers, a witness called by the defense, was present at the Clay Street home on November 26 and found Johns' body. Regarding the Clay Street home, Sayers also testified he observed "white people at odd times of the night back and forth." He saw "other people back and forth constantly who didn't live there." He did not think they were there buying lottery tickets. The people who appeared to be selling drugs appeared to be in competition.

Donald Carpenter ("Donald"), Michael Carpenter's brother and Johns' cousin, also acquired his drugs (pain medication, morphine, oxycontin, lortabs, crack cocaine) from the Clay Street home. He would go with Johns "pretty much once a week." They could inject the drugs at the home if they wanted, and would also hang out there from time to time. Sometimes they would stay at the house overnight in the back bedroom or kitchen. Carter and Calvin Westry were some of the people Donald would get drugs from at the Clay Street home between 1988 to 2005. Although Carter stayed at his own home, he would also be at the Clay Street home from time to time. Between his purchases of drugs at the house on Maple Street and the Clay Street home (and whenever he went to one house he would also go to the other), Donald estimates he made about one hundred trips in over 20 years.

Toni Johns, Jasen Johns' widow, sometimes accompanied Johns when he would stop by the Clay Street home to pick up drugs.

*Testifying Co-Defendants and Purchasers of Narcotics (Addicts)*

Four Co-Defendants who pled guilty before trial were trial witnesses for the government. Jones remembered seeing drugs sold from the Clay Street home when she was about five years old, and started selling drugs herself at the age of sixteen. If someone was on the porch at the Clay Street home, they usually had drugs to sell. She knew her uncle Calvin was involved in selling drugs from the Boykin Towers apartment.

Leonard Westry, Rose's son and Lucious' grandson, testified that Rose was involved in selling drugs, and his uncle, Calvin, who lived at the Clay Street home from time to time, also sold drugs occasionally. Leonard also saw Woodyard selling pills (lortabs, oxycontin, morphine) to people on various occasions near the Clay Street home. Leonard saw Woodyard get the pills from Uncle Calvin. Carter, Leonard's uncle-in-law, also sold pills (lortabs and morphine) at the Clay Street home.

Hogue and Zuniga were married. Zuniga is Lucious' great-grandson. Hogue entered a written plea of guilty after the trial started. Hogue observed a variety of drug activities at the Clay Street home, including transactions by

16

Zuniga. She observed Calvin Westry and Woodyard selling drugs out of the Clay Street home. Woodyard would come to her begging for pills. She saw Westry sell pills from Boykin Towers. She saw Carter selling drugs. In 2003 Hogue started supplying pills to people.

Beckham, Lucious' nephew, pled guilty to conspiracy to distribute drugs. He was involved in drug distribution from the Clay Street home beginning in 2001. He had seen Carter selling drugs at the Clay Street home since 2003. According to Beckham, Woodyard was involved in selling drugs there, "but not very often." Beckham knew Westry was involved in drug distribution at the Clay Street home, and saw Chill (Hinton) "shooting pills" at the Clay Street home.

In addition to the testifying Co-Defendants, several purchasers of the narcotics supplied by the extended Westry family testified at trial. Their testimony concerns drug purchases as early as 1992 at the Clay Street home. Stephanie Healy, who after being arrested worked undercover for the police, testified that when there were no drugs at the Clay Street home, somebody would drive or ride with her to the house at 459 Maple Street. She bought morphine from Carter "probably 25, 30 times."

Gary Brown bought pills from the Clay Street home as often as three times a day, and purchased oxycontin or morphine from Carter approximately 20 times

17

from 2001 to 2002. Stephen Allen bought drugs from Westry once or twice, and obtained pills from Carter 15-20 times. He also bought drugs at 459 Maple Street.

*Discovery of Firearms*

Guns possessed by members of the conspiracy were found during three searches. On October 1, 1998, a "plethora of pills" were found in Lucious' brassiere, and crack cocaine and a pistol were discovered in Lucious' bedroom at the Clay Street home during a search, following a controlled buy. Several years later, on July 27, 2004, a search warrant was executed at the residence of Co-Defendant, Riley, who Jones identified as a supplier of drugs for herself and other conspirators, including Carter and Woodyard. At the July 27 search, officers found 20 pills in Riley's shirt pocket, another estimated 5,755 pills in the residence (of which approximately 1,500 were hydrocodone tablets), and assorted methadone, morphine, and oxycontin pills. Two rifles and a handgun were recovered at Riley's house that day.

Lastly, on June 30, 2005, the day of the federal raid at the Clay Street home, officers seized a loaded Rossi .38 caliber revolver, various drugs, and drug paraphernalia. The revolver had been reported stolen. Among the persons present in and around the home were Lucious, Rose, Beckham, Jones, Osborne, Tammy Perrymand, and Westry.

## II.  DISCUSSION

As stated, Appellants raise various challenges to their convictions and sentences.  We group the issues raised on appeal where appropriate.  Woodyard, Hinton and Carter challenge the sufficiency of the evidence to support their convictions.  Carter argues that the district court abused its discretion in overruling his hearsay objection to Carpenter's testimony that Carter provided cocaine to Jasen Johns shortly before Johns' death.  Westry and Carter assert the district court abused its discretion by refusing to give requested jury instructions.  All Defendants appeal their sentences.

### A.     Appellants' Sufficiency of the Evidence Claims

We review the district court's denial of Defendants' motions for judgment of acquittal based on sufficiency of the evidence under Rule 29, Federal Rules of Criminal Procedure, *de novo*.  United States v. Evans, 473 F.3d 1115, 1118 (11th Cir. 2006).  "In determining whether the government produced sufficient evidence, we must review the evidence in the light most favorable to the government and draw all reasonable factual inferences in favor of the jury's verdict."  United States v. Dulcio, 441 F.3d 1269, 1276 (11th Cir. 2006) (citation omitted).  All that must be found is that a "reasonable fact-finder could have determined that the evidence

proved" Defendants' guilt beyond a reasonable doubt.  United States v. Smith, 459 F.3d 1276, 1286 (11th Cir. 2006) (citation omitted).

All Defendants, with the exception of Westry, challenge the sufficiency of the evidence to support their convictions.  All Defendants also challenge the sufficiency of the evidence supporting several sentencing enhancements imposed, following interrogatories answered by the jury, and these are addressed in Section D of this opinion.  We now briefly summarize the evidence as to each of the three Defendants who challenge its sufficiency with respect to their convictions for conspiracy.

Willie Carter

Carter lived at the Clay Street home with his wife, Cynthia Young, Lucious' daughter, who also sold drugs.  Co-Defendant Jones testified that Carter (her uncle) had been selling drugs, including pills and cocaine, for as long as she could remember.  Leonard testified he had seen Carter (his uncle-in-law) sell pills at the Clay Street home.  Leonard accompanied Carter on trips to buy crack cocaine. Hogue testified that Carter was involved in the distribution of drugs, and she had seen Carter sell crack, oxycontin, morphine and other pills.  According to Hogue, she saw Carter involved in the distribution of drugs "Every day, all day."

Beckham, Young's cousin, knew Carter was involved in the drug business and had seen him sell oxycontin and morphine pills since 2003. According to Beckham, Carter used and sold crack. Beckham obtained oxycontin and morphine from Carter and sold the pills at the Clay Street home.

Under the direction of Officer McKean, confidential informant, Elrod Miller, made a controlled buy of morphine from Carter at 459 Maple Street. Confidential informant, Eric Beverly, also purchased a $20.00 piece of crack cocaine from Carter.

Drug addict, Stephanie Healy, testified she obtained drugs at the Clay Street home from Carter from 25 to 30 times. Addict, Cynthia Sowell, identified Carter as one of her regular suppliers at Clay Street. Addict, Gary Brown, testified he bought drugs (oxycontin and morphine) from Carter approximately 20 times at Clay Street. Addict, Stephen Doyle Allen, testified he bought pills from Carter from 15 to 20 times.

Mack Woodyard

Co-Defendant Jones testified Woodyard sold drugs at the Clay Street home, obtaining the drugs, including crack, from other conspirators and "whoever had it." Leonard testified he saw Woodyard sell oxycontin and morphine on the corner at 406 Clay Street. Leonard knew Woodyard acquired his pills from Calvin

21

Westry. Hogue testified she saw Woodyard selling oxycontin, morphine, lortab, methadone, and "whatever kind of pills he could get his hands on" at Clay Street. Hogue stated Woodyard obtained his pills from Hogue and others, including Jones, Lucious, and Zuniga. Beckham testified Woodyard sold drugs (morphine, oxycontin) at the Clay Street home, "but not very often."

The undercover activities of Officer McKean also corroborated the foregoing testimony as to Woodyard. Officer McKean bought drugs from Woodyard on October 11, 2002 (Count Four) and on October 12, 2002 (Count Five). Recordings of several of the drug deals were admitted in evidence. On at least two occasions when Officer McKean went by the area, Woodyard asked the officer if he had "been served."

Willie Hinton

Jones testified that Hinton lived with her uncle, Calvin Westry, at the Boykin Towers apartment and drove Westry's vehicles on occasion. Before she saw Hinton associated with her uncle, Jones would see Hinton on Clay Street "coming to buy pills," specifically, morphine. She, too, supplied Hinton with morphine pills if she had them. While at the beginning the pills were for Hinton's personal use, the amount he acquired increased, and she had the understanding the pills were for Hinton and someone else.

22

According to Hogue, Calvin Westry was involved in the distribution of drugs from the Boykin Towers apartment, as she accompanied Kimberly Westry, Calvin's daughter, for the pick up of pills (oxycontin). Calvin would give Kimberly instructions as to where to go with the pills. And Hinton "used to be there."

Beckham observed Hinton at the Clay Street home "[s]hooting up pills," or using a needle, in the kitchen. Beckham described Hinton as a "junkie." Leonard also testified to having seen Hinton at the Clay Street home and knowing him to be a friend of his uncle Calvin. Confidential informant Foxx testified she sometimes gave Hinton a ride to a house on Maple Street. Hinton would exit the vehicle and enter the house while Foxx drove around the block. When she returned, Hinton would get in the car, and the two would travel back to the Boykin Towers apartment.

Officer McKean's undercover buy from Westry on November 16, 2002 involved Hinton. Hinton appears in the telephone calls setting up the undercover drug deal as well as the tape recording of the drug deal itself. During the course of that drug purchase (three oxycontin tablets), Hinton asks the officer for gas money, and the officer paid Hinton five dollars. Officer McKean also spoke with

Hinton over the telephone on November 18, 2002 when the officer was arranging a drug buy at the Boykin Towers apartment that was consummated later that day.

Sufficient evidence supports Defendants' convictions.

A conviction for conspiracy to distribute drugs in violation of 21 U.S.C. § 846 requires evidence that persuades the trier of fact beyond a reasonable doubt, that (1) a conspiracy (or agreement) existed between Defendants or between Defendants and others; (2) Defendants knew the essential objects of the conspiracy, which are to do either an unlawful act or a lawful act by unlawful means; and (3) Defendants knowingly and voluntarily participated in the conspiracy. See United States v. Calderon, 127 F.3d 1314, 1326 (11th Cir. 1997); see also United States v. Toler, 144 F.3d 1423, 1426 n.3 (11th Cir. 1998); United States v. Garcia, 405 F.3d 1260, 1269 (11th Cir. 2005); United States v. Thompson, 422 F.3d 1285, 1290 (11th Cir. 2005). We have previously acknowledged that because a conspiracy is "predominantly mental in composition," circumstantial evidence is frequently resorted to in order to prove its elements. Toler, 144 F.3d at 1426 (internal quotation marks omitted). A conspiracy may be inferred from a "concert of action." United States v. Guerra, 293 F.3d 1279, 1285 (11th Cir. 2002). See also Glasser v. United States, 315 U.S. 60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct

24

evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'"); United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983) ("A conspiracy conviction will be upheld . . . when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him.").

The government asserts that the evidence presented at trial was sufficient to establish beyond a reasonable doubt that Defendants were engaged in a conspiracy to distribute controlled substances between March 1998 and June 30, 2005. We agree. The trial testimony of several Co-Defendants, drug purchasers, and law enforcement (39 witnesses in over five days of trial), and the audio recordings, audio and video CDs, and audio and video DVDs of drug transactions, show a long-standing conspiracy involving the distribution of drugs (morphine, oxycodone, hydrocodone, hydromorphine, methadone, and 50 grams or more of cocaine), among an assortment of family members and associates of Lucious in and around the Clay Street home, 456 and 459 Maple Street, and at the Boykin Towers apartment. This conspiracy, the various acts of distribution at these several locations performed by numerous interrelated individuals, survived several attempts by local law enforcement, several state arrests and sentences served by its

members, several search warrants that uncovered the presence of drugs and guns, all over a period of years, until the June 30, 2005 arrests on federal charges precipitated the charging documents filed in this case. The testimony and evidence squarely place Defendants as knowing members of the conspiracy.

Carter and Woodyard, in particular, challenge the sufficiency of evidence supporting the existence of a conspiracy, pointing to testimony and evidence suggesting a high degree of competitiveness among members to effectuate the sale of drugs. Consistent with the notion of competition, and hence, the lack of an agreement, Woodyard asserts that the evidence, at best, shows him to have been a street dealer who took the opportunity to make sales to individuals who were destined to make their purchases at the Clay Street home, but who were intercepted by Woodyard before reaching their destination.

Other courts have considered and rejected this defense of "we were not in a conspiracy, because the evidence showed we were competitors for drugs or customers." In United States v. Johnson, the court made an observation that applies equally in the present case: "While the record demonstrates that the principals, including Appellants, shared many sources, distributors, and customers, the fact that drug dealers 'may sometimes, or even always, compete for supplies or customers in serving that market does not on that account alone disprove . . . the

existence of a single conspiracy to achieve the overall results of their several efforts.'"  54 F.3d 1150, 1154-55 (4th Cir. 1995) (quoting United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993)).  In Banks the court identified a more significant consideration than competition in determining the membership of actors in a drug conspiracy to be "whether the actor 'demonstrated a substantial level of commitment to the conspiracy, [for example] by engaging in a consistent series of smaller transactions' that furthered its ultimate object of supplying the consumer demand of the market."  Banks, 10 F.3d at 1054 (quoting United States v. Edwards, 945 F.2d 1387, 1393 (7th Cir. 1991).

We agree with the reasoning of Johnson and Banks.  While admittedly several of the conspirators were shown, through testimony and the audio and video surveillance, to have competed with each other in the sale of drugs and the procurement of customers, their combined efforts produced a haven for the illegal distribution of drugs at the Clay Street home, 456 and 459 Maple Street, and the Boykin Towers Apartment, among an assortment of Lucious' family members and associates.  The evidence showed their interrelatedness; how one member would retrieve drugs for the sale by another.  The existence of healthy competition, as evidenced by Woodyard achieving sales in the vicinity of the Clay Street home and waylaying purchasers destined for the home, does not negate the ultimate object of

27

all the participants: supplying the consumers' demands in and around the property. Indeed, the more sellers of drugs there were, the more activity in and around the locations.

Hinton argues the evidence against him only showed him to be a bystander at an apartment where drug activities occurred, not a member of the charged conspiracy. As to Hinton's argument, we are similarly not persuaded. First, mere presence "'is material, highly probative, and not to be discounted.'" United States v. Gamboa, 166 F.3d 1327, 1332 (11th Cir. 1999) (quoting United States v. Freeman, 660 F.2d 1030, 1035 n.1 (5th Cir. Unit B Nov. 1981)). Second, here the evidence showed more than Hinton's mere presence. It showed him to be an active participant in Officer McKean's undercover buy on November 16, 2002, accepting a cash payment from the officer to cover the expense of having traveled to obtain the oxycontin Westry sold to the officer, in Hinton's presence. This evidence, coupled with Hinton's association with Westry and residence at the Boykin Towers apartment, where drug transactions were shown to have taken place, and the testimony of other co-conspirators placing Hinton at the Clay Street home and related locations, could give "'rise to a permissible inference'" by the jury of Hinton's participation in the conspiracy. Id. (quoting Calderon, 127 F.3d at 1326).

The jury plainly credited the testimony and evidence presented, and it is not

28

for us to re-weigh the factfinder's credibility choices.  United States v. Simpson,

228 F.3d 1294, 1299 (11th Cir. 2000) (citation omitted).  When measured against

the governing standards, we are persuaded that sufficient evidence was presented to

sustain the conspiracy convictions, and accordingly affirm the district court's

denial of the motions for judgment of acquittal.

> B.      Carter's Hearsay Objection

Carter timely objected when the prosecutor asked Michael Carpenter about

the events surrounding Johns' death.  The following exchange took place:

> Q.      And when you left, what was going on there at the house?
> A.      He was waiting, he said he was waiting on somebody to come
> with some cocaine, that he had – waiting on some cocaine to
> come in.
>
> Q.      And do you know who?
>
>           *                    *                    *
>
> Q.      Do you know who he was waiting on?
> A.      Bip, he said.
>
>           *                    *                    *
>
> Q.      And when you left, had Bip arrived?
> A.      Yeah.  He was just coming in, and they went to the back.

Carter maintains the district court erred in allowing the government to elicit

information about the source of the cocaine Johns used, and without the

29

objectionable answers containing the words Johns spoke to Carpenter, there would have been no other evidence presented concerning the source of the controlled substances that caused or contributed to Johns' death.

We review the district court's evidentiary rulings for "clear abuse of discretion." United States v. Perez-Oliveros, 479 F.3d 779, 783 (11th Cir. 2007) (citation omitted). Appellant must demonstrate that "'the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact.'" United States v. Smith, 459 F.3d 1276, 1295 (11th Cir. 2006) (quoting United States v. Baker, 432 F.3d 1189, 1202 (11th Cir. 2005)).

The government agrees that Carpenter's statements concerning what Johns told him are hearsay statements admitted for the truth of the matter asserted, presumptively inadmissible under Rule 802 of the Federal Rules of Evidence. See Fed. R. Evid. 802. Nonetheless, the government suggests several hearsay exceptions apply, most notably the Rule 804(b)(3) exception. Rule 804(b)(3) permits admission of a hearsay statement "which [] at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed. R. Evid. 804(b)(3). "To be admissible under Rule

804(b)(3), a statement must satisfy three elements: "(1) the declarant [must be] unavailable; (2) the statement so far tends to subject the declarant to criminal liability that a reasonable person in his position would not have made the statement unless he believed it to be true; and (3) the statement is corroborated by circumstances clearly indicating its trustworthiness." United States v. Costa, 31 F.3d 1073, 1077 (11th Cir. 1994) (citations omitted); see also United States v. Harrell, 788 F.2d 1524, 1526 (11th Cir. 1986) (citations omitted).

While a determination of whether a statement is against the declarant's penal interest is purely a question of law subject to *de novo* review, see Costa, 31 F.3d at 1077, consideration of a statement's trustworthiness requires a review of findings of fact and a review of the trial court's application of a legal standard to the facts. See United States v. Bagley, 537 F.2d 162, 166 (5th Cir. 1976). Because the trial court made no finding regarding the applicability of the statement against penal interest exception, or any other hearsay exception, we "'determine whether any reasonable view of the evidence,'" United States v. Gossett, 877 F.2d 901, 907 (11th Cir. 1989) (quoting Bagley, 537 F.2d at 167), supports the trustworthiness of Johns' statements.

The first element is easily satisfied, as Johns was unavailable to testify at trial. The second element, whether the statements were against Johns' penal

31

interest, we also resolve in the affirmative, although not without some explanation. For a statement to be "against penal interest," it must "so far tend to subject the declarant to criminal liability that a reasonable man in his position would not have made the statement unless he believed it to be true." Harrell, 788 F.2d at 1527. Initially, given Johns' close relationship to Carpenter, it would appear that Johns would not have believed his statements would subject him to criminal liability.

However, it is unnecessary that the declarant know he was speaking to a person who could cause his prosecution. Id. Thus, for example, courts have held that the mere fact that the recipient of the information was a confidante of the declarant does not rule out admissibility of a statement as against interest. See Bagley, 537 F.2d at 165 ("The fact that the statement was made to a friend and cellmate has no relevance to the determination whether the statement was against the declarant's penal interest."); United States v. Mock, 640 F.2d 629, 631 (5th Cir. 1981) ("fact that the statement was made to his former wife does not destroy its credibility"); Harrell, 788 F.2d at 1527 (refusing to "engraft" onto the second element of the Rule a "requirement that appellants must know that they were being recorded and that they must know that they were speaking with persons who could have caused their prosecution"); Costa, 31 F.3d at 1078-79 (distinguishing custodial statements implicating self and others from "spontaneous declarations"

32

made to acquaintances, friends and confederates; the latter being more trustworthy) (citations omitted). Under the circumstances presented here, we do not think a reasonable man would falsely admit to waiting for cocaine at the Clay Street home, a serious crime, knowing there was a chance, albeit slight, that the admission could be used to subject him to severe penalties. See Harrell, 788 F.2d at 1527; United States v. Lang, 589 F.2d 92, 97 (2d Cir. 1978) (fact that statement was made to friend and cellmate not relevant to whether statement was against declarant's penal interest).

The last element to consider, then, is whether the statements are corroborated by circumstances clearly indicating their trustworthiness. Prior to the admission of the statements, the government had elicited testimony from Carpenter that he and his cousin Johns used drugs together from about 1998 until Johns' death in 2001, and that they usually obtained their drugs at the Clay Street home. Carpenter had explained he and Johns were injecting methadone in a back room of the Clay Street home before Carpenter left, before Johns stated he would wait on "somebody to come with some cocaine," and that the somebody was "Bip" or Carter. Sufficient corroborating circumstances were presented to satisfy the trustworthiness element, and thus we conclude the statements were admissible as statements against Johns' penal interest under Rule 804(b)(3), Federal Rules of Evidence.

33

## C.    *Westry and Carter's Requested Jury Instructions*

Westry assigns error to the trial court's refusal to give a requested instruction on withdrawal from the conspiracy. Testimony was presented that after Westry pled guilty to a state court indictment, and returned to the Clay Street home on probation, he was no longer involved in the federal offenses charged in Counts Thirty-One and Thirty-Two. Carter submits the trial court erred in failing to charge the jury that it must determine the amount of controlled substances that was foreseeable to Carter within the scope of his participation in the conspiracy, and if the death of Johns was caused by controlled substances foreseeable to Carter within the scope of his participation in the conspiracy.

A trial court's refusal to give a jury instruction requested by the defense is reviewed for abuse of discretion. See Dulcio, 441 F.3d at 1275 (citation omitted). To constitute reversible error, a defendant must show that the requested jury instruction "'(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury.'" Id. (quoting United States v. Brazel, 102 F.3d 1120, 1139 (11th Cir. 1997)).

34

Westry claims the following testimony of Shannon Jones supports his claimed withdrawal from the conspiracy, and consequently, supports his requested charge on withdrawal:[6]

Q.  Do you remember about when it was that he [Westry] moved back to Clay Street?

A.  It was a little while after the State had indicted us the first time.

Q.  Okay.  And would that have been sometime around the end of 2003, later?

A.  Perhaps, yes.

Q.  After Calvin moved back to Clay Street, did you ever see whether or not he was involved with the distribution of drugs?

A.  He really didn't – no, he wasn't involved there, you know.  He was on probation.  Basically, he just said, enough.

Under governing law, the foregoing exchange, without more, is insufficient to support Westry's requested instruction.  We begin with the very language of the instruction: "[I]n order for you to decide that a Defendant withdrew from a conspiracy you must find that the Defendant took affirmative action to disavow or defeat the purpose of the conspiracy . . . ."  Offense Instruction 13.4.  As the comments to the Instruction make clear, withdrawal is an affirmative defense that

_____

[6] See Eleventh Circuit Pattern Jury Instructions, (Criminal Cases) (2003), Offense Instruction 13.4, "Withdrawal From Conspiracy (For Use With General Conspiracy Charge)," 18 USC § 371.

the defendant has the burden to prove. We have held that a defendant must prove "he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, *and* either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities." United States v. Finestone, 816 F.2d 583, 589 (11th Cir. 1987) (emphasis in original); see also United States v. Young, 39 F.3d 1561, 1571 (11th Cir. 1994). The defendant's burden to establish the defense is substantial; hence, "mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." Finestone, 816 F.2d at 589 (citations omitted).

Jones' testimony is insufficient to satisfy Westry's burden of showing withdrawal. At best, her testimony could support a mere cessation of activity.[7] Consequently, the trial court did not abuse its discretion in refusing to give Westry's requested instruction, as the issue was not properly before the jury on the record developed.

---

[7] Beckham testified the last time he had drug dealings with Westry was in mid-June of 2005, before the federal raid.

Carter proposed two instructions concerning foreseeability of the drug amounts involved in the conspiracy and the death enhancement.[8]  The trial court declined to give the requested instructions, finding that the combination of the special verdict form and the charges, including a Pinkerton[9] charge, sufficiently covered the issues sought to be addressed in Carter's requested instructions.  The trial court instead instructed as follows on the issues of foreseeability:

> If you find any defendant guilty as to Count One, you will then be asked to specify on the verdict form your unanimous finding concerning the weight of the mixture or substance containing cocaine base that the Government has proved beyond a reasonable doubt.  You will not be required to determine the exact amount; rather, the verdict form requests that you determine the drug amount by ranges.
>
> For instance, you may indicate by range, that is, less than five grams, five grams or more but less than 50 grams, or 50 grams or more.  Such amounts must be proven by the Government beyond a reasonable doubt.

---

[8] As to the drug amounts, Carter proposed that the court instruct the jury: "If you find the Defendant guilty beyond a reasonable doubt of Count One, you must then find beyond a reasonable doubt the amount of substances which were foreseeable to the Defendant within the scope of his participation in the conspiracy."  As to the death enhancement, he proposed: "If you find the Defendant guilty beyond a reasonable doubt of Count One, you must then find beyond a reasonable doubt whether the methadone that caused the death of Jasen Johns was within the scope of the Defendant's participation in the conspiracy."

[9] Pinkerton v. United States, 328 U.S. 640 (1946).

The Pinkerton instruction stated, in part, that if a defendant was found guilty of the conspiracy offense, the jury could find the defendant guilty of the substantive offense(s):

> even though such Defendant did not personally participate in such offense if you find beyond a reasonable doubt, first, that the offense charged in such count was committed by a conspirator during the existence of the conspiracy and in furtherance of its objects; second, that the Defendant under consideration was a knowing and willful member of the conspiracy at the time of the commission of such offenses; and third, that the commission of such offense by a co-conspirator was a reasonably foreseeable consequence of the conspiracy.

We agree with the trial court that the foregoing combination of instructions properly and sufficiently instructed the jury in its consideration of the foreseeability of the drug amount and Johns' death, two of the applicable enhancements. See United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007) ("[T]his court will reverse the district court only if we are left with a substantial, ineradicable doubt as to whether the jury was properly guided in its deliberations in this regard.") (citation omitted). We similarly find no abuse of discretion in the denial of the requested instructions, which duplicated the information already provided in the Pinkerton instruction given.

D. *Sentencing Issues*

Appellants raise several challenges to their sentences, including enhancements applied and the reasonableness of their sentences. The government has conceded error in several instances. We review the district court's application of the Sentencing Guidelines *de novo*, and its factual findings for clear error. See United States v. Watkins, 477 F.3d 1277, 1279 (11th Cir. 2007). We review *de novo* the legality of a sentence. See United States v. Moriarty, 429 F.3d 1012, 1025 (11th Cir. 2005). As to a challenge for reasonableness, we review the sentences "under a deferential abuse-of-discretion standard." Gall v. United States, 128 S.Ct. 586, 591 (2007).

Defendants were sentenced as follows. On Count One, Conspiracy, all Defendants received sentences of life imprisonment. On the substantive offenses, Defendants were each sentenced to life sentences (Westry on Counts Eleven and Twelve; Woodyard on Counts Four and Five; and Hinton on Count Ten), with the exception of Carter, who was sentenced to 60 years' imprisonment on each of Counts Fifteen and Twenty-Four, to run concurrently. Defendants received the maximum possible offense level under the Guidelines on the bases that they had prior similar convictions[10] and a death resulted from the conspiracy, pursuant to

---

[10] Prior to trial, the government filed "Informations," pursuant to 21 U.S.C. § 851, notifying Defendants it intended to rely on their prior felony convictions for drug offenses.

39

U.S.S.G. § 2D1.1(a)(1) (the "death enhancement"). Defendants' offense levels were also enhanced based on possession of a firearm, under U.S.S.G. § 2D1.1(b)(1). With the exception of Carter's convictions on the two substantive counts, all sentences were enhanced to life on the basis that a death resulted from the offense and Defendants each had a prior conviction for a felony drug offense under 21 U.S.C. §§ 841(b)(1)(A) and (b)(1)(C).

Defendants challenge application of the death enhancement to the conspiracy convictions (Count One), and Westry, Woodyard and Hinton challenge application of the death enhancement to the substantive offenses. Carter asserts the drugs that killed Johns did not come from the conspiracy, and that he did not have a prior conviction for a similar offense. Hinton and Westry also maintain Johns' death was not reasonably foreseeable. Woodyard asserts he was not a member of the conspiracy when Johns died, and that Johns' death was not a reasonably foreseeable act or omission done in furtherance of the conspiracy.

Carter and Westry assert the district court erred by applying the firearm enhancement, under U.S.S.G. § 2D1.1(b)(1) to increase their base offense levels. Woodyard claims his sentences are grossly disproportionate, in violation of the Eighth Amendment. Lastly, Carter claims the relevant conduct pertaining to the

conspiracy count should not have been considered in calculating his guideline range, and that his sentence, too, is unreasonable.

      1.      The Jasen Johns Death Enhancement as to Count One (Conspiracy) for Westry, Carter and Hinton

     As to applicability of the death enhancement to the conspiracy convictions of Westry, Carter and Hinton, we find no error. The guidelines for offenses charged under 21 U.S.C. § 846, the conspiracy count (Count One), are found at U.S.S.G. §§ 2D1.1 and 1D1.2. If a defendant is convicted for conspiracy to violate 21 U.S.C. § 841(b)(1)(A), the offense of conviction establishes that death or serious bodily injury resulted from use of the illegal substance, and the defendant committed the offense after one or more prior convictions for a similar offense, section 2D1.1(a)(1) of the Sentencing Guidelines sets the base offense level at 43, or life. See also 21 U.S.C. § 841(b)(1)(C).[11]

"In determining the base level of the charged offense, the district court must consider as relevant all conduct actually undertaken by, or taken at the direction of, the defendant, § 1B1.3(a)(1)(A), and in the case of a conspiracy, all acts by other participants that were both reasonably foreseeable and in furtherance of the

---

[11] Section 841(b)(1)(C) provides in part, "If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment of not more than 30 years and if death or serious bodily injury results from the use of such substance shall be sentenced to life imprisonment . . . ."

conspiracy, § 1B1.3(a)(1)(B)." United States v. Matthews, 168 F.3d 1234, 1247 (11th Cir. 1999). Conspirators are certainly "'only accountable for [co-conspirator] conduct that was reasonably foreseeable and within the scope of the criminal activity that the defendant agreed to undertake.'" United States v. Chisholm, 73 F.3d 304, 308 (11th Cir. 1996) (quoting United States v. Reese, 67 F.3d 902, 906-08 (11th Cir. 1995)). Consequently, although "a conspirator may reasonably foresee other criminal acts, he is not accountable for those acts if they were not part of the scope of the criminal activity he agreed to undertake." Id. (citing Reese, 67 F.3d at 907).

The medical examiner's report introduced in evidence showed that Johns died at the Clay Street home on November 27, 2001 from an overdose caused by injecting methadone, with cocaine as a contributing factor. Prior to his death, Johns had frequently obtained drugs from the Clay Street home and from members of the charged conspiracy. Two of the drugs distributed during the course of the conspiracy included methadone and cocaine, and the jury specifically found these drugs were objects of the conspiracy.

As to the cocaine, Johns' statements to Carpenter support the conclusion that Carter supplied Johns with the cocaine that contributed to Johns' death. Westry, however, supplied Carpenter with a place to stay, Westry's apartment, so Carpenter

could spend the night after having injected methadone with Johns in the back room of the Clay Street home. Hinton was present in Westry's apartment that night.

The issue presented is whether a death of one of the several addicts who purchased drugs at the Clay Street home was reasonably foreseeable to the conspirators. Where a conspirator is involved in distributing drugs to addicts, some of which are even administered intravenously, it is a reasonably foreseeable consequence that one or more of those addicts may overdose and die. See e.g., Spero v. United States, 375 F.3d 1285, 1286 (11th Cir. 2004). It is of no moment that two of these conspirators, at the time of Johns' death, were not residents of the Clay Street home, as the evidence showed their activities to be linked to the activities of others at the Clay Street home, even on the night in question. Because Johns died from a drug overdose from drugs distributed by a member of the conspiracy (Carter), and the goal of the conspiracy was to distribute drugs, Johns' death was reasonably foreseeable and within the scope of the conspiracy.

Therefore, we find no clear error in the jury's or trial court's conclusion that the death was reasonably foreseeable, or the trial court's application of the death enhancement to Count One as to Westry, Carter, and Hinton.[12]

_____

[12] Carter also argues that he was not convicted of a prior similar offense, as required for application of the death enhancement. Carter had a prior felony conviction in Alabama for possession of pentazocine, which meets the requirements for the death enhancement under

2.    The Jasen Johns Death Enhancement as to Count One (Conspiracy) for Woodyard

Like Westry, Carter, and Hinton, Woodyard challenges the death enhancement on his sentence in Count One, but for a different reason. Woodyard asserts the trial court erred in applying the death enhancement to increase his sentence on Count One to a life sentence (challenging the sufficiency of the evidence supporting the jury's verdict on this enhancement as well), because no evidence was presented establishing that Woodyard was a member of the conspiracy prior to Johns' death. We agree.

Regarding conspirators in existence at the time of Johns' death, Carpenter identified Bip (Carter) and Calvin (Westry) as people from whom Carpenter (and Johns) would buy drugs. Shannon Jones testified she was in prison when Johns overdosed and died, and further, that she met Woodyard after she was released from prison. Leonard testified that Woodyard did not begin living at the Clay Street home until sometime in 2004. Hogue testified she did not supply Woodyard with pills for sale until sometime in 2003. Woodyard was never identified as being present during any of the executions of the several search warrants at the Clay Street home. A review of the evidence shows the earliest Woodyard may be placed

_____

section 841(b)(1)(A). See 21 U.S.C. § 802(13); Ala. Code § 13A-12-212(b). Thus, Carter's argument is unavailing.

in or around the Clay Street home, and hence in the conspiracy, was March 2002, upon Jones' release from prison.

The government's meager response to the paucity of evidence linking Woodyard to the conspiracy prior to Johns' death is to reference Jones' testimony in which she stated she had known Woodyard since 2000, because he would stay at the home on 459 Maple Street. Woodyard rented a room from Jones' uncle, Brett, at 459 Maple Street, and Uncle Brett would sell drugs "[e]very now and then." And while, as we have stated, repeated presence at the scene of drug trafficking is a circumstance standing alone that can give rise to a permissible inference of participation in the conspiracy, see, e.g., Calderon, 127 F.3d at 1326, the only evidence of Woodyard's membership in the conspiracy prior to Johns' death is evidence of Woodyard's mere presence and association with one or more of the conspirators. See United States v. Perez-Tosta, 36 F.3d 1552, 1557 (11th Cir. 1994). On the basis of this portion of Jones' testimony alone, we cannot conclude that sufficient evidence was presented showing Woodyard to be a member of the conspiracy before November 27, 2001.

A defendant cannot be held accountable for conduct that occurred prior to his entry into the conspiracy. United States v. Hunter, 323 F.3d 1314, 1320 (11th

45

Cir. 2003). The jury's and the trial court's finding[13] that Woodyard was a member of the conspiracy prior to Johns' death, as it is based on insufficient evidence, must therefore be set aside and the sentence on Count One vacated.[14]

3.    The Jasen Johns Death Enhancement as to the Substantive Offenses

The government has conceded it was error for the district court to apply the death enhancement to Woodyard's, Hinton's and Westry's sentences on the substantive drug distribution counts because the criminal conduct giving rise to the substantive counts occurred after Johns' death. See 21 U.S.C. §§ 841(b)(1)(C) and (b)(1)(D). We accept the concession. Accordingly, the sentences on Counts Four and Five (Woodyard), Count Ten (Hinton), and Counts Eleven and Twelve (Westry) are vacated.

4.    The Firearm Enhancement

Carter assigns error to the firearm enhancement, under U.S.S.G. § 2D1.1(b)(1), asserting there was no evidence to prove the firearm recovered in the Clay Street home was possessed in furtherance of the conspiracy, or that possession

---

[13] In contrast to the jury's decision on this issue, the trial court's conclusion of reasonable foreseeability is based on the lesser evidentiary burden of preponderance of the evidence. See, e.g., United States v. Cover, 199 F.3d 1270, 1274 (11th Cir. 2000).

[14] Because we conclude application of the death enhancement to Woodyard was in error, we do not reach Woodyard's argument that his sentence is grossly disproportionate in violation of the Eighth Amendment.

of the firearm by a co-conspirator was reasonably foreseeable. Westry maintains he should not have received the firearm enhancement because he was not a member of the conspiracy at the time the firearm was possessed.

To apply the firearm enhancement of U.S.S.G. § 2D1.1(b)(1) based on a co-conspirator's gun possession, the government must show by a preponderance of the evidence that "(1) the possessor of the firearm was a co-conspirator, (2) the possession was in furtherance of the conspiracy, (3) the defendant was a member of the conspiracy at the time of the possession, and (4) the co-conspirator possession was reasonably foreseeable by the defendant." United States v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999) (footnote omitted) (emphasis removed). Once the government shows that a firearm is present at the site of the charged conduct, "'the evidentiary burden shifts to the defendant to show that a connection between the firearm and the offense is clearly improbable.'" United States v. Fields, 408 F.3d 1356, 1359 (11th Cir. 2005) (quoting United States v. Hall, 46 F.3d 62, 63 (11th Cir. 1995)).

We find no error in the trial court's conclusion that the firearm recovered at the Clay Street home, a stolen Rossi .38 caliber revolver, was a reasonably foreseeable circumstance arising from the long-standing operation of a drug house, and was in the constructive possession of a conspirator. See, e.g., Fields, 408 F.3d

47

at 1359 (a connection between seized firearm and drug conspiracy was not clearly improbable where firearms were present at locations where coconspirators sold illegal drugs). Defendants presented no evidence that a connection between the firearm and the offense was improbable. And, we have already addressed and rejected Westry's claim of withdrawal from the conspiracy.

In any event, because the firearm enhancement did not affect Defendants' overall sentences, given application of the death enhancement had already produced the maximum possible sentences on Count One, if there was any error, it was harmless. See, e.g., United States v. Raad, 406 F.3d 1322, 1323 n.1 (11th Cir. 2005) (where a district court correctly imposes the statutory minimum sentence, any error in the guidelines calculations is harmless and we need not address the guidelines calculations).

### 5. Carter's Sentence

Carter challenges his life sentence on the conspiracy count and the 60-year sentences on the substantive counts as unreasonable. Review of the reasonableness of the length of a sentence is undertaken in light of the facts and circumstances of the Defendant's case, as they relate to the sentencing considerations of 18 U.S.C. § 3553(a). United States v. Williams, 456 F.3d 1353, 1363 (11th Cir. 2006). A remand for resentencing due to the unreasonableness of a sentence occurs only "if

we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Id. (citations omitted).

Carter advances the argument that if the trial court had used the drugs associated with each substantive offense conviction for Count Fifteen (two morphine tablets on February 18, 2003) and Count Twenty-Four (.08 grams of cocaine base on January 6, 2005), rather than considering drugs associated with conduct extrinsic to the incidents (i.e., conduct associated with the conspiracy), the base offense levels for each would have been substantially lower (excluding the firearm enhancement). On Count Fifteen, the guideline range would have been 12 months and on Count Twenty-Four, 12 to 16 months. The trial court's decision to impose the maximum statutory imprisonment of 60 years on each consequently cannot be considered as reasonable, argues Carter.

Because Carter did not raise this issue below, we review for plain error. See United States v. Bennett, 472 F.3d 825, 831 (11th Cir. 2006) (objections to sentencing calculation issues raised for first time on appeal are reviewed for plain error). The standard requires that there be error, the error be plain, and the error affect a substantial right. Id.

Here there is no error, as the trial court properly grouped Carter's offenses together under the Guidelines. The offense levels for the convictions for possessing with intent to distribute drugs and conspiring to possess with intent to distribute drugs are determined by looking to the quantity of the substances involved. See U.S.S.G. § 2D1.1(c). The base offense levels for the three offenses of conviction are determined by looking at section 2D1.1, and U.S.S.G. § 3D1.2 provides that such offenses are to be grouped together. See U.S.S.G. § 3D1.2, App. A. Moreover, the relevant conduct for the conspiracy with intent to distribute morphine and cocaine base was part of the same course of conduct as the convictions for possession with intent to distribute morphine and cocaine base, as the substantive offenses were committed during the time period covered by the conspiracy. Thus, the district court properly grouped the offenses together and considered the conspiracy conduct relevant to the substantive offense conduct to determine Carter's total offense level. See U.S.S.G. § 1B1.3(a)(2) and comment (n.9B).

The district court stated it considered the section 3553(a) factors, and in light of the facts and circumstances surrounding the offenses of conviction, as the trial court articulated at sentencing, Carter has not satisfied his burden of demonstrating that his sentences on the substantive offenses are unreasonable. Given our prior

50

analysis pertaining to the life sentence mandated on Count One by 21 U.S.C. § 841(b)(1)(A), that sentence, too, is reasonable.

### III. <u>CONCLUSION</u>

For the reasons stated above, we vacate the sentences on Counts One, Four, and Five as to Woodyard; Count Ten as to Hinton; and Counts Eleven and Twelve as to Westry, and remand for resentencing.  In all other respects, we affirm the denial of the motions for judgment of acquittal, the trial court's evidentiary rulings and rulings on proposed jury instructions, and the remaining sentencing issues addressed.  AFFIRMED in part, VACATED in part, and REMANDED.