UNITED STATES of America,
Plaintiff-Appellee,

v.

Leonard FINESTONE,
Defendant-Appellant.

No. 86–5224.

United States Court of Appeals,
Eleventh Circuit.

May 7, 1987.

Charles G. White, Miami, Fla., for defendant-appellant.

Leon B. Kellner, U.S. Atty., Linda Collins Hertz, Asst. U.S. Atty., Miami, Fla., Frank J. Marine, Organized Crime and Racketeering Section, Washington, D.C., for plaintiff-appellee.

Before TJOFLAT and EDMONDSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

Appellant, Leonard Finestone, was convicted in the district court of conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d) (1982) (RICO) (count one), of conspiring to import marijuana, in violation of 21 U.S.C. § 963 (1982) (count four), and of conspiring to possess with intent to distribute in excess of 1,000 pounds of marijuana, in violation of 21 U.S.C. § 846 (1982) (count five). He appeals, seeking a new trial, on three grounds: (1) the trial judge abused his discretion by not asking certain questions requested by appellant during the court's voir dire examination of prospective jurors; (2) the trial judge abused his discretion by admitting evidence of an execution-style murder and certain marijuana smuggling engaged in or committed by other members of the charged conspiracies; and (3) the trial judge erred by refusing to give appellant's requested instructions on appellant's defenses of withdrawal from the alleged conspiracies and alibi, as well as on his general theory of defense. Appellant's first ground is frivolous and requires no discussion. For the reasons stated below, we find no merit in appellant's second and third grounds. We accordingly affirm his convictions.

I.

Count one alleged that from 1978 to the date of the indictment, January 11, 1985, appellant and others conspired to participate in the affairs of an enterprise through a pattern of racketeering activity. The enterprise purportedly consisted of a group of individuals, headed by Raymond Thompson (the "Thompson enterprise"), associated in fact for the purposes of, among others, deriving financial profit from importing and distributing marijuana, taking various measures to avoid detection and to conceal the enterprise's affairs, and murdering James Savoy to benefit the enterprise. Appellant allegedly captained and maintained boats that were used in the marijuana smuggling venture and provided other assistance to the enterprise. Count four charged that appellant and others involved in the count one offense conspired from 1978 to July 15, 1981 to import marijuana into the United States. Count five alleged that they conspired to possess, with intent to distribute, more than 1,000 pounds of marijuana.

The Government's proof established that the Thompson enterprise operated in southern Florida, as alleged, during the period set forth in the indictment, and that appellant knowingly participated in each of the charged conspiracies. The Thompson enterprise smuggled large quantities of mari-

juana into the United States, using various boats to pick up loads of marijuana from ships located beyond the territorial waters of the United States. The marijuana was usually transferred from larger boats to smaller boats, owned by Thompson, that traveled to yacht basins in the Fort Lauderdale area, where the marijuana was off-loaded. The marijuana was then put onto trucks for distribution. To avoid detection, the enterprise frequently changed the names of the boats it used and often had middle-aged persons on the boats to serve as decoys, posing as tourists or fishermen.

At times, the Thompson enterprise employed as many as one hundred persons in its smuggling business. Among its principal members were Irving Schrager, who managed the Amity Yacht Center in Fort Lauderdale (used to store and repair Thompson's boats and as the center for loading the marijuana onto trucks); Charles Allred, who aided Schrager in supervising the importation and distribution of the marijuana; appellant, Robert Stephens, Robert Sheer, Kurt Vierthaler, and Paul Vierthaler, all of whom captained boats the enterprise used to smuggle the marijuana; and Patrick Menillo, Scott Errico, and Michael Vierthaler, all of whom served as crew members on these boats.

In addition to serving as a boat captain, appellant helped maintain the boats, performing electrical and other work, and handled inquiries from the enterprise's workers when Thompson was not available. With this factual background in mind, we turn to appellant's second and third claims of reversible error.

## II.

Appellant contends that the district court abused its discretion by admitting evidence of the kidnapping and murder of James Savoy and of the conspirators' importation of marijuana in June 1978, November 1980, and June 1981, because appellant was not directly involved in those acts and the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. *See* Fed.R.Evid. 403. We are not persuaded.

■ The Federal Rules of Evidence favor admission of any evidence tending to prove or disprove a fact in issue. *United States v. King*, 713 F.2d 627, 631 (11th Cir.1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984). The "balance [under Rule 403] should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir.1980) (citation omitted); *accord King*, 713 F.2d at 631; *United States v. Moore*, 732 F.2d 983, 988–89 (D.C.Cir.1984). Appellate courts "must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Jamil*, 707 F.2d 638, 642 (2d Cir.1983) (quoting *United States v. Brady*, 595 F.2d 359, 361 (6th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979)); *accord United States v. Zipkin*, 729 F.2d 384, 389–90 (6th Cir.1984); 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[03], at 403–47 (1986).

The district court's discretion to exclude evidence under Rule 403 is limited. Evidence may be excluded only when "its probative value is substantially outweighed by the danger of unfair prejudice." Fed.R. Evid. 403. As we have cautioned, "Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Betancourt*, 734 F.2d 750, 757 (11th Cir.) (citing *United States v. King*, 713 F.2d 627, 631 (11th Cir.1983), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984)), *cert. denied*, 469 U.S. 1021, 105 S.Ct. 440, 83 L.Ed.2d 365 (1984), *and* 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984); *accord United States v. Plotke*, 725 F.2d 1303, 1308 (11th Cir.), *cert. denied*, 469 U.S. 843, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). In sum, the district court is vested with considerable discretion to admit evidence, and its decision to admit evidence may "not be reversed on appeal unless the defendant can demonstrate abuse of that discretion." *United States v. Mitchell*, 666 F.2d 1385, 1390 (11th Cir.) (citations omit-

ted), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2943, 73 L.Ed.2d 1340 (1982).

## A.

The Government placed before the jury the following facts concerning the kidnapping and murder of James Savoy. Savoy was a self-employed carpenter. In 1979, Thompson made him a part of the enterprise. He hired Savoy to construct some special cabinets for two of his smuggling boats in order to conceal the bales of marijuana that were to be transported.

In late June 1981, after a law enforcement search of the Amity Yacht Center threatened the security of the drug smuggling operation, Thompson had Savoy build a safe in the concrete floor of Savoy's carpentry shop and gave him $500,000 to $600,000, proceeds of the enterprise's marijuana smuggling, to keep there. In the fall of that year, Savoy disappeared, apparently taking the money Thompson had left with him. Thereafter, Thompson, appellant, Robert Davis, Patrick Menillo, Scott Errico, and the others involved in the enterprise began looking for Savoy. At some time between late 1981 and the early part of 1982, appellant, Thompson, Thaddeus Pryor, Errico, Menillo, and others met at Thompson's residence to discuss the matter. Appellant indicated that he felt responsible for the Savoy "rip off" because it would not have occurred had he not introduced Savoy to Thompson. Appellant stated that he, and some of the others, had been looking for Savoy at the local racetracks.

In March 1982, Robert Stephens saw Savoy at the Cricket Club bar in Pompano, Florida, and he related this information to Robert Davis. The following day, Stephens, Davis, Thompson, Menillo, and Errico went to the Cricket Club and saw Savoy there. One day later, Davis, Errico, and Menillo brought Savoy to Stephens' house; Savoy's hands and feet were taped. Shortly thereafter, Thompson arrived at Stephens' house, and Thompson and Menillo

questioned Savoy about the theft of the money. Savoy said that he had become involved with a "hooker" and that she stole the money. Savoy was then taken to Thompson's house. The next morning, Thompson, Stephens, Menillo, and Robert Davis took Savoy out to sea on one of Thompson's boats. They shot Savoy and threw him overboard.

The Government placed these events in evidence to prove the count one RICO conspiracy. That count, in charging that kidnapping and murder were part of the Thompson enterprise's pattern of racketeering activities, alleged that "[f]or the benefit of 'the Enterprise' the defendants Raymond Michael Thompson, Patrick Anthony Menillo, Scott Nicholas Errico, Robert Marion Stephens, and other persons would kidnap and murder James Savoy." In addition, count one cited Savoy's kidnapping and murder as overt acts committed in furtherance of the conspiracy. Aside from proving these elements of the RICO offense, the challenged evidence also demonstrated the participation of others in the conspiracy.

We rejected a claim of error identical to appellant's in *United States v. Hawkins,* 681 F.2d 1343 (11th Cir.), *cert. denied,* 459 U.S. 994, 103 S.Ct. 354, 74 L.Ed.2d 391 (1982), a case involving circumstances strikingly similar to those presented here.[1] The defendant in that case, Hawkins, was convicted under the RICO statute of conspiracy and of substantive charges, and of possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1982). The Government produced evidence that a Hawkins co-conspirator murdered Horace Davis for failing to pay a $40,000 narcotics debt to the RICO enterprise and for giving law enforcement information about the conspirators' activities. The indictment cited murder as one of the patterns of racketeering activity but did not mention the Davis murder. On appeal, Hawkins contended that he was unduly prejudiced by the admission of this evi-

---

1. The details of the murder involved in *Hawkins* are derived from the briefs and record on appeal in that case.

dence because he was not involved in the murder and, moreover, because the murder was not mentioned in the indictment. We rejected these contentions:

> Contrary to the defendant's argument, there was no error in admitting evidence of a murder because the indictment includes murder as one of the offenses in the pattern of defendants' racketeering activity. *See United States v. Elliott,* 571 F.2d 880, 911 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Both the substantive and the conspiracy RICO counts mentioned murder and threat of murder as part of the activity of the organization even though the indictment did not charge murder. There was a sufficient link to the racketeering activity so that the admission of murder evidence was not an abuse of discretion.

*Hawkins,* 681 F.2d at 1346.

*Hawkins* is dispositive of appellant's argument concerning the Savoy kidnapping and murder. The trial judge committed no error, much less an abuse of discretion, by admitting the evidence concerning those events. The kidnapping and murder were admissible to prove a pattern of racketeering activity and overt acts, elements of the count one RICO conspiracy. Furthermore, those events were admissible to prove the membership and participation in the RICO conspiracy of those who kidnapped and killed Savoy. Finally, those events were admissible to prove that the conspiracy continued to exist after January 11, 1980, thus rendering appellant's five-year statute of limitations defense inoperative and rebutting appellant's claim that he withdrew from the conspiracy before that date.

### B.

The Government placed before the jury the following facts concerning drug smuggling activities, between 1978 and 1981, of some of appellant's co-conspirators. In early 1978, Robert Stephens began to work for the Thompson enterprise. At that time, appellant was doing maintenance work on Thompson's boats, including the 42–foot *Evelyn K,* at Rolly's Marina in Fort Lauderdale; appellant also served as a boat captain. Appellant became acquainted with Stephens while working at Rolly's Marina. Stephens took a Thompson speedboat that was moored at the marina, picked up about 600 pounds of marijuana in Bimini, and brought it to Thompson's house in south Florida.

In June 1978, Stephens, using the *Evelyn K,* picked up another load of marijuana (sixty to seventy bales) from a boat off the west end of Grand Bahama Island and brought it to Rolly's Marina. The next day, Stephens, following Thompson's directions, took some of the marijuana to a house in Fort Lauderdale. (Law enforcement officials subsequently seized that marijuana.)

Toward the end of 1978 or early in 1979, Thompson hired Robert Sheer (as a boat captain), Thaddeus Pryor (to help off-load marijuana), and Alyann C. Burke (to pose as a tourist and fisherman decoy on his smuggling boats). Thompson told Sheer to direct any questions he might have to appellant if Thompson was not available.

In early 1979, Thompson moved his boats and the center of the smuggling operation to the Amity Yacht Center. At the same time, he made Stephens a captain on one of his boats. At this point, appellant was captaining the Thompson boat, *My Maisy,* a 45–foot sport fisherman. In March 1979, three boats, including the *My Maisy* with appellant at the helm, left the Amity Yacht Center on a two-day "dry trip," pretending to be on a fishing trip.

In April 1979, Thompson met with three of his boat captains, including appellant, before they departed on a smuggling run. Their boats were the *Quo Vadis* (captained by Robert Sheer), the *Lorelei,* and the *My Maisy* (captained by appellant). Thompson explained that in the Bahamas they were to rendezvous with a sailboat, the *Wendy II,* take on a load of marijuana, and return to the Amity Yacht Center.

As the three boats approached the rendezvous point, near an island named Honeymoon Harbor in the Bahamas, ten miles

south of Bimini, the *Lorelei* caught fire and had to be towed to Bimini. The *Quo Vadis* and the *My Maisy* met with the *Wendy II* as planned. The *Quo Vadis* took on approximately 10,000 pounds of marijuana while the *My Maisy* stood by. The *Quo Vadis* and the *My Maisy* then returned to the Amity Yacht Center, where the marijuana was off-loaded.

In early summer 1979, Robert Sheer and appellant took the *Quo Vadis* and the *My Maisy* to another rendezvous with the *Wendy II* near Honeymoon Harbor. On this occasion, the *My Maisy* took on a large load of marijuana. It transported the marijuana to the Amity Yacht Center where it was off-loaded. In the fall of 1979, appellant, again captaining the *My Maisy*, Sheer, and others made another run to the Honeymoon Harbor area, and the *My Maisy* returned to the Amity Yacht Center with a load of marijuana.

In late 1979, Thompson told Sheer that he was expecting shortly a large load of marijuana and needed more vessels to make the run. He instructed Sheer to help acquire them. Sheer agreed, and he and appellant "sea tried" a 53–foot Hatteras to determine its suitability. Thompson purchased that boat and another boat as well. In January 1980, Sheer, Stephens, and others picked up the marijuana (approximately 190,000 pounds) from a freighter near Honeymoon Harbor. The *My Maisy* was one of the boats that brought the marijuana to the Amity Yacht Center. In June, July, and August 1980, Thompson's organization brought three more loads of marijuana to the Amity Yacht Center, while appellant was working there.

On November 20 of that year, the United States Coast Guard seized 18,000 pounds of marijuana, which was to go to the Thompson enterprise, from the *Wendy II*. At the same time, Bahamian officials boarded one of Thompson's boats and arrested Alyann Burke, Scott Errico, and other members of the organization. Thompson provided them with attorneys and arranged for their release.

In June 1981, Robert Sheer and others acquired approximately 35,000 pounds of marijuana in several boats from a freighter in the Bahamas and transported it to the Amity Yacht Center, where it was off-loaded and stored. Several days later, on June 24, Thaddeus Pryor was arrested as he was transporting 1,446 pounds of marijuana from the Amity Yacht Center in a van. The next day, law enforcement officials, executing a search warrant, seized approximately 25,240 pounds of marijuana from the Amity Yacht Center and 2,083 pounds of marijuana from a van parked there.

The challenged evidence of these marijuana smuggling activities was highly probative of each of the charged conspiracies, especially the count four and five conspiracies to import and to possess marijuana with intent to distribute. The evidence established the following: the existence of the charged conspiracies, their mode of operation, various overt acts in furtherance of the conspiracies, conspirators' participation in the conspiracies, that the conspirators agreed to possess with intent to distribute in excess of 1,000 pounds of marijuana (an essential element of the count five conspiracy), and that the conspiracies continued to function after January 11, 1980, into the applicable five-year statute of limitations period. In sum, the district court did not abuse its discretion by admitting the contested evidence of marijuana importation and possession.

## III.

Appellant contends that the district court committed reversible error by refusing to give his requested instructions on the defenses of withdrawal and alibi, and on his general theory of defense. His contention is meritless.

A refusal to deliver a requested jury instruction is reversible error only if the instruction (1) is substantially correct, (2) is not substantially covered by others delivered, and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to present a given defense. *United States v. Luis-Gonzalez,* 719 F.2d 1539, 1545 (11th Cir.1983) (citations omitted). In addition, the requested instruction

must be supported by sufficient evidence to warrant the instruction, and the "court is not bound to use the exact words and phrasing suggested by counsel in its charge." *United States v. Russell,* 717 F.2d 518, 521 (11th Cir.1983) (citations omitted). Applying these standards, we conclude that the district court properly refused to give the requested instructions.

It is well settled that an accused conspirator's participation in a criminal conspiracy is presumed to continue until all the objects of the conspiracy have been accomplished or until the last overt act is committed by any of the conspirators. *See Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *United States v. Pearson,* 508 F.2d 595, 597 (5th Cir.1975);[2] *United States v. Krasn,* 614 F.2d 1229, 1236 (9th Cir.1980); *United States v. Basey,* 613 F.2d 198, 202 (9th Cir.1979), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 274 (1980).

The indictment in this case was handed down on January 11, 1985; therefore, the statute of limitations barred prosecution of the three charged offenses if they terminated before January 11, 1980. However, the indictment alleged, and the evidence showed, that the three conspiracies continued after January 11, 1980. Consequently, the statute of limitations did not bar the prosecution.

■ A conspirator can overcome the presumption of his continued participation in the conspiracy by showing that he withdrew from it. Withdrawal, however, is an affirmative defense, which the defendant has the burden of proving. *See, e.g., Hyde v. United States,* 225 U.S. 347, 369, 32 S.Ct. 793, 803, 56 L.Ed. 1114 (1912); *United States v. Garcia,* 721 F.2d 721, 725 (11th Cir.1983) ("[T]he defendant bears the burden of proof to show that he withdrew from the conspiracy by affirmatively acting to defeat or disavow the conspiracy....") (citation omitted). The defendant's burden in this regard is substantial. To establish that he withdrew from a conspiracy, the defendant must prove that he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, *and* either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities. *See, e.g., United States v. United States Gypsum Co.,* 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978); *Hyde,* 225 U.S. at 368–69, 32 S.Ct. at 802–03. A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal. *See, e.g., Hyde,* 225 U.S. at 369, 32 S.Ct. at 803; *United States v. Badolato,* 701 F.2d 915, 921 n. 4 (11th Cir.1983).

■ Here, as the district court properly found, appellant failed to demonstrate that he took any affirmative step to disavow his involvement in the charged conspiracies. Moreover, assuming for the sake of argument that he did take an affirmative step, he did not communicate his disavowal to his co-conspirators or disclose the illegal scheme to law enforcement authorities. Thus, he was not entitled to a withdrawal instruction.

■ Even if we were to assume that the evidence warranted a withdrawal instruction, appellant cannot claim that the trial court erred in failing to give one, because the instruction he proposed inaccurately stated the law.[3] First, the instruc-

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**3.** Appellant requested the following instruction: It is the position of Leonard Finestone that should you believe that Leonard Finestone entered into a conspiracy to commit racketeering as charged in Count I, the conspiracy to import marijuana as charged in Count III, or a conspiracy to possess with intent to distribute over 1,000 pounds of marijuana as charged in Count IV, that he had effectively withdrawn from all participation in those conspiracies prior to January 25, 1980. Once Mr. Finestone has presented evidence that he withdrew and disassociated himself from the conspiracies charged, then it becomes the burden of the Government to disprove his withdrawal beyond a reasonable doubt. If the Government fails to disprove Mr. Finestone's withdrawal from these conspiracies prior to January 25, 1980, then Mr. Finestone cannot

tion incorrectly indicated that appellant was entitled to an acquittal if he withdrew from the conspiracy before January 25, 1980, when the applicable date, as appellant now concedes, was January 11, 1980. More fundamentally, appellant's proposed instruction did not properly state that he had the burden to *prove* withdrawal before the burden shifted to the Government to demonstrate the contrary. In addition, appellant's instruction erroneously indicated that withdrawal would be established if appellant merely "disassociated himself from the conspiracies charged." It is well established, however, that mere cessation of activities is insufficient to establish withdrawal.

It requires no extended discussion to reject appellant's arguments concerning his alibi and theory of defense instructions. Appellant was not entitled to his requested alibi instruction [4] because, as the district court correctly concluded, the instruction misstated the law and was not supported by the evidence. The court properly rejected appellant's theory of defense instruction [5] because it presented nothing more than an argument to the jury.

## IV.

We have carefully examined each of appellant's claims of error and find no reason to grant him a new trial. Accordingly, appellant's convictions are

**AFFIRMED.**

---

be convicted because the Statute of Limitations for these offenses has run and you must find him not guilty.

4. Appellant's proposed Jury Instruction No. 2 contained the following alibi instruction:

It is the position of Leonard Finestone that the Government has failed to prove that he committed or agreed to commit two predicate acts of importation or attempted importation of marijuana into the United States sufficient to establish his involvement in a racketeering enterprise as charged in Count I. There is evidence that at the time that witnesses for the Government testified that these predicate acts of importation or attempted importation of marijuana took place, Leonard Finestone was away from the State of Florida or otherwise unavailable to participate in the commission of such crimes. Keep in mind that the Government must always prove beyond a reasonable doubt the knowing participation by defendant in any criminal offense or incident charged.

5. Appellant's Proposed Jury Instruction No. 1 contained the following theory of defense instruction:

It is the position of LEONARD FINESTONE that he was never a member of any criminal organization headed by Ray Thompson as charged in Count I. It is further his position that he never intended or agreed to join the conspiracy to import marijuana charged in Count III or the conspiracy to possess with intent to distribute over 1,000 pounds of marijuana as charged in Count IV. It is the position of LEONARD FINESTONE that he was merely a personal friend and one-time employee of Ray Thompson and performed cer-

tain acts for him without the intent to join any criminal organization or enterprise or other conspiracy as charged in Counts I, III and IV.

While there may have been some evidence introduced at the trial that LEONARD FINESTONE may have been aware of the existence of Ray Thompson's criminal organization or had knowledge of some of the illegal acts committed by other co-defendants or employees of Ray Thompson in this case, such knowledge does not, in and of itself, make Mr. Finestone a party to the conspiracy or the enterprise as charged in Counts I, III and IV. Mere presence at the scene of the crime and even knowledge that a crime is being committed are not sufficient to establish the guilt of Mr. Finestone. You must find beyond a reasonable doubt that Mr. Finestone was a willful participant and not merely a knowing spectator.

It is the position of LEONARD FINESTONE that the witnesses who have testified about him, in particular those witnesses who were members of Ray Thompson's criminal organization who made plea bargain deals with the Government, have lied and/or exaggerated their testimony in order to benefit themselves. As the Court will advise you in other portions of these instructions, if you find that a witness' testimony has been affected by his or her having been advised of the Government's intent not to prosecute them, or receipt of immunity from punishment, plea bargain deals, or by his or her interest in the outcome of the case, it is your right to give that testimony such weight, if any, that you think it deserves. You have the right to reject such testimony entirely if you believe the witness has been so affected.