[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 13, 2010
JOHN LEY
CLERK

No. 08-12378

_____

D. C. Docket No. 07-20772-CR-FAM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SAUL ANDRES WYNTER,
a.k.a. Kiki,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 13, 2010)

Before CARNES, ANDERSON and STAHL,[*] Circuit Judges.

_____

[*]Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by
designation.

PER CURIAM:

Saul Andres Wynter appeals his convictions for two drug trafficking offenses, raising two issues. He contends that the district court erred by giving the jury a <u>Pinkerton</u> instruction. See <u>Pinkerton v. United States</u>, 328 U.S. 640, 66 S. Ct. 1180 (1946). He also contends that there was insufficient evidence to convict his co-conspirator of the underlying offense of possession with intent to distribute cocaine, and for that reason his conviction on that count cannot stand.

I.

Wynter was charged with drug trafficking offenses along with co-defendants Dulce Castellanos, her husband Martin Castellanos, and their son-in-law William Martinez. Martinez and both of the Castellanos were also charged with money laundering offenses. Counts 1, 2, and 3 of the indictment involved Wynter. Count 1 alleged that from December 1995 through October 23, 2007 all four defendants conspired to possess 5 kilograms or more of cocaine and 1 kilogram or more of heroin with the intent to distribute those drugs, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 2 alleged that on January 23, 2007, Wynter and Martinez possessed 5 kilograms or more of cocaine with the intent to distribute it in violation of § 841(a)(1). Count 3 alleged that on March 15, 2007, Wynter, Martinez, and Martin Castellanos possessed 1 kilogram or more of heroin

2

with the intent to distribute it in violation of § 841(a)(1).[1]

After a jury trial, Wynter and Dulce Castellanos were convicted of all of the charges against them, and the district court entered judgment on the verdict.[2] Martin Castellanos and Martinez are fugitives, and they did not stand trial. Wynter was sentenced to life imprisonment as to each count running concurrently, followed by concurrent 5-year supervised release periods, and he was ordered to pay a $300 special assessment.

## II.

### A.

Wynter contends that the district court erred by giving the jury a Pinkerton instruction because the crimes charged in counts 2 and 3 of the indictment (possession with intent to distribute cocaine in January 2007 and heroin in March 2007) did not fall within the scope of the conspiracy and were not reasonably foreseeable consequences of it. He argues that his relationship to the substantive

---

[1]Wynter was not charged in the remaining counts. Count 4 alleged that Martinez and both of the Castellanos conspired to engage in money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Count 5 alleged that on March 15, 2007, Martin Castellanos engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (2). Count 6 alleged that on March 15, 2007, Dulce Castellanos engaged in money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (2). The indictment also contained a forfeiture allegation.

[2]Dulce Castellanos originally appealed that judgment at the same time that Wynter did, but this Court has granted Castellanos' request to continue oral argument in her case. As a result, this appeal now involves only Wynter.

crimes charged in counts 2 and 3 was so attenuated that it violated his due process rights to convict him of them.

At the jury charge conference, Wynter's counsel objected to the <u>Pinkerton</u> instruction that the district court proposed to give. In response to his objection the district court suggested adding some language to that instruction to explain to the jury that in order for Wynter to be convicted on the conspiracy charge, the government had to prove three things: (1) that the substantive crimes were committed by a conspirator within the scope of the conspiracy and in furtherance of its objectives; (2) that Wynter was a knowing and willful member of the conspiracy at the time the substantive crimes were committed; and (3) that the co-conspirator's commission of the substantive crime was a reasonably foreseeable consequence of the conspiracy. After the district court suggested doing that, the following exchange occurred:

> [DEFENSE COUNSEL]: I can't give you a case that says that's wrong. Those last words, a reasonably foreseeable consequence, those words trouble me because that implies something that wasn't the goal of the conspiracy, but something that happened, anyway.
>
> THE COURT: That's what <u>Pinkerton</u> is.
>
> [DEFENSE COUNSEL]: But this is cocaine, not an extraneous crime.
>
> THE COURT: The difference between that is what?

4

[DEFENSE COUNSEL]: The difference is —

THE COURT: For murder it would have been okay?

[DEFENSE COUNSEL]: Yes.

THE COURT: But for a drug offense, it wouldn't?

[DEFENSE COUNSEL]: For anything but cocaine, those words, reasonably foreseeable consequence, I concede are correct. But we're not dealing with reasonably foreseeable consequences. We're dealing with the actual objective of the conspiracy.

THE COURT: See, the problem is this conspiracy was so long. There are a lot of drug deals going on. That's what the Government does say. There were drug deals going on all the time. This is a long-term conspiracy. They just happened to catch the actual drugs in two instances many years after the beginning. And with Saul Wynter not directly participating in it except as a co-conspirator beforehand.

The district court ended up giving the jury this slightly modified <u>Pinkerton</u> instruction on the conspiracy charge against Wynter:

> In some instances a conspirator may be held responsible under the law for a substantive offense in which he had no direct or personal participation if such offense was committed by other members of the conspiracy during the course and within the scope of such conspiracy and in furtherance of the object of the conspiracy.

> So, in this case, with regard to Counts 2 and 3 of the indictment, they are called substantive counts, the possession of cocaine and heroin, and insofar as the defendant, Saul Wynter, is concerned, if you have first found the defendant guilty of the conspiracy offense as charged in Count 1 of the indictment, you may also find such defendant guilty of the offenses charged in Counts 2 and 3 of the indictment even though such defendant did not

5

personally participate in such offense if you find beyond a reasonable doubt:

First: That the offense charged in such count was committed by a conspirator during the existence of the conspiracy, within the scope of the agreement, and in furtherance of the object of the conspiracy;[3]

Second: That the defendant was a knowing and willful member of the conspiracy at the time of the commission of such offense; and

Third: That the commission of such offense by a co-conspirator was a reasonably foreseeable consequence of the conspiracy.

So, all three things would have to be proven in this particular case.

The court also instructed the jury on multiple conspiracies and explained that to convict Wynter of conspiracy, the jury must find beyond a reasonable doubt that he participated in the specific conspiracy charged in the indictment and not some other, separate conspiracy:

And you are further instructed, with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspiracies which is proved is the single conspiracy which the indictment charges.

---

[3]This part of the instruction slightly modifies the Eleventh Circuit pattern Pinkerton instruction, which requires a jury to find only "[t]hat the offense charged in such count was committed by a conspirator during the existence of the conspiracy and in furtherance of its objects." Eleventh Circuit Pattern Jury Instructions (Criminal), Offense Instruction No. 13.5 (2003). The district court added the requirement that the substantive offense must have been "within the scope of the agreement" between Wynter and Martinez. In all other respects the court followed the pattern jury instruction. See id.

6

What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendants of that charge. However, if you decide that such a conspiracy did exist, you must then determine who the members were. And if you should find that a particular defendant was a member of some other conspiracy that is not charged, not the one charged in the indictment, then you must acquit the defendant.

In other words, to find the defendant guilty, you must unanimously find that such defendant was a member of the conspiracy charged in the indictment and not a member of [an]other separate conspiracy.

The court also gave the jury a statute of limitations instruction on

conspiracy:

The statute of limitations for drug offenses is five years. In this case the Government arrested defendant, Saul Wynter, on August 28, 2007. If you find that the conspiracy to possess cocaine or heroin with intent to distribute ended before August 29, 2002, you must find the defendant not guilty on Count 1. The issue is not the last act of a particular conspirator, but the conspiracy itself. Because a co-conspirator is responsible for the acts of a co-conspirator, of other co-conspirators — for the acts of other co-conspirators in furtherance of the conspiracy.

Let me read this again.

Because a co-conspirator is responsible for the acts of other co-conspirators in furtherance of a conspiracy, the statute of limitations begins to run when the conspiracy charged ends and not necessarily as of the last act of a conspirator.

B.

7

"Reviewing the jury instructions actually given, as a whole, this court will reverse the district court only if we are left with a substantial, ineradicable doubt as to whether the jury was properly guided in its deliberations in this regard." United States v. Dohan, 508 F.3d 989, 993 (11th Cir. 2007). "[T]he scope of our review is limited. The application of the Pinkerton doctrine to a particular set of facts ultimately is for the jury to decide." United States v. Alvarez, 755 F.2d 830, 848 (11th Cir. 1985).

In the present case the district court correctly charged the jury with the law that a co-conspirator may be held responsible for the acts of other co-conspirators under certain circumstances. It is well established that "[e]ach party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in the furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof." United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir. 1996). There is no co-conspirator liability "if the substantive crime 'did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.'" Id. (quoting Pinkerton, 328 U.S. at 647–48, 66 S. Ct. at 1184). But even crimes that occur "'as a result of an

8

unintended turn of events'"—if those events are reasonably foreseeable—can be the basis of Pinkerton liability. Id. (quoting Alvarez, 755 F.2d at 850).

Co-conspirator liability extends for as long as the conspiracy remains ongoing. See United States v. Finestone, 816 F.2d 583, 589 (11th Cir. 1987) ("It is well settled that an accused conspirator's participation in a criminal conspiracy is presumed to continue until all the objects of the conspiracy have been accomplished or until the last overt act is committed by any of the conspirators."). To overcome the presumption that he has continued to participate in the conspiracy until the bitter end, a defendant must show that he withdrew from the conspiracy. Id. We have explained:

> The defendant's burden in this regard is substantial. To establish that he withdrew from a conspiracy, the defendant must prove that he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, and either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities. A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal.

Id. (citations and emphasis omitted).

In the present case, the indictment charges a conspiracy to commit drug trafficking crimes that spans 12 years, beginning in December 1995 and ending in October 2007. Wynter contends that he never agreed to the commission of the

9

cocaine and heroin possession with the intent to distribute crimes by co-conspirator Martinez that are alleged in counts 2 and 3 of the indictment. The indictment charged that those crimes were committed in January and March of 2007. Wynter argues that his relationship to those crimes was attenuated because (1) evidence showed that he was last involved in illegal drug activities in 2005; (2) there was a lack of evidence showing that he was the source of the drugs on which counts 2 and 3 of the indictment were based; (3) it was not foreseeable that Martinez would traffic in drugs on his own and outside of the scope of the conspiracy with Wynter.

To support his assertions, Wynter points to the testimony of Rafael Santana, a cooperating government witness. Santana testified that he got drugs from Martinez instead of from Wynter during 2004 to 2005.[4] Santana testified that from 1997 to 1998 he trafficked drugs with Wynter, but after 1998 he was not directly involved with Wynter. Santana testified that as late as 2005 he did drug deals with Martinez but not with Wynter: "Well, during that time in 2004 to 2005, no, I did not meet up with Wynter because at that time he was just calm down. He was in hiding, but he was just calm." Wynter asserts that Santana's statement means that Wynter was no longer actively involved in drug trafficking, but he points to no

---

[4]Santana testified that he "was arrested in 2005 for heroin conspiracy."

evidence showing that is the correct interpretation of Santana's cryptic statement.

More important, even if Santana's statement does mean what Wynter says it does, it was not made in front of the jury. Santana made that statement while the district court and the prosecutor were questioning him outside of the jury's presence.[5] According to Wynter, Santana's statement shows that a reasonable jury could not have convicted Wynter of conspiracy based on drug deals occurring in 2007 because Wynter had not been involved in drug trafficking since 2005. At least as far as it is based on that particular testimony by Santana, Wynter's argument fails because the jury did not even hear Santana's statement.

As for Wynter's activities through 2005 in relation to count 2 of the indictment, the government contends that it presented plenty of evidence that Wynter was involved with "copious amounts of cocaine" and that he conspired with Martinez to traffic drugs. According to the government, it was foreseeable as part of the ongoing conspiracy that Martinez would deliver cocaine to a buyer on January 23, 2007, as charged in count 2. In addition to Santana's testimony that Martinez and Wynter were involved in drug trafficking together, some of which the jury did hear, the government also relies on the testimony of Gregory James,

_____

[5]The court excused the jury and asked the prosecutor where he was going with this witness, and "[w]hat's Santana . . . going to say about Saul Wynter?"

11

who was serving a life sentence in prison after being convicted of drug trafficking and firearm offenses.

James testified that he had known Wynter since 1998, when he began trafficking cocaine with him in kilogram quantities. James also testified that after he moved to Georgia in 1999 or 2000, he received more than 100 kilograms of cocaine from Wynter. Until James was imprisoned in 2004, he continued to buy cocaine from Wynter.[6] The drugs were given to James up front; he sold them and gave Wynter the proceeds in cash. "The Courtland Club," where James was living in Georgia, was in Wynter's name, and Wynter also kept a "stash house" in Georgia where James would pick up drugs. James testified that Martinez was "there most of the time" when James was conducting drug transactions with Wynter.[7]

The government also relies on Osvaldo Ortega's testimony that, when he was arrested in 2003, he had 150 kilograms of cocaine in his possession, and he was going to give those drugs to "Gregory James, Panama, and Kenneth Head."

---

[6]James was arrested for drug trafficking after he was stopped driving a vehicle and was found to have $150,000 in cash.

[7]According to James, Wynter threatened him while the two of them were in lock-up before James testified. Another witness, Santana, also testified that Wynter had threatened him, but the court instructed the jury to disregard Santana's testimony. The court stated: "And I am going to instruct you to disregard the statement of Mr. Santana, the witness, regarding threats. There is no proof that any defendant on trial has threatened that witness and Santana's family."

During his testimony, Ortega identified Wynter as "Panama." He stated that he had met Wynter in 2001. He also testified that in 2008, before Wynter's trial, he identified "Panama" in a photo line-up.

Juan Herrera, who at the time of Wynter's trial was imprisoned for trafficking 400 to 700 grams of heroin, testified that he trafficked drugs with Wynter from "August 2001 into 2003." Herrera testified that he personally received a kilogram of heroin from Wynter in Miami, and Herrera took the drugs to New York to sell. Around the same time, Wynter told Herrera that someone had stolen a van he owned containing 70 to 75 kilograms of cocaine. Herrera also testified that he traveled with Wynter to Wynter's native country of Panama for the purpose of cocaine trafficking.

All of that evidence is more than sufficient to show that Wynter was involved in large scale drug trafficking until as late as 2005, and Wynter does not seriously dispute that. Wynter's challenge to his conspiracy conviction is that the government failed to show that he continued to be involved in the charged conspiracy to traffic in drugs in 2007. The problem with Wynter's argument is that he presented no evidence whatsoever showing that he took any steps to withdraw from the conspiracy at any time. See United States v. Westry, 524 F.3d 1198, 1216 (11th Cir. 2008) ("[W]ithdrawal is an affirmative defense that the

13

defendant has the burden to prove.").

As we have already explained, a defendant has to take affirmative steps to disavow or to defeat the conspiratorial objectives and must communicate about those acts with his co-conspirators or with law enforcement. See id. at 1216–17 (quoting Finestone, 816 F.2d at 589). Simply stopping activity in the conspiracy is not enough to establish withdrawal. Id. at 1217. But stopping activity is all Wynter even attempts to argue that he did.

Furthermore, the government presented evidence that could have led a reasonable jury to find that Wynter had connections to his co-defendant, Dulce Castellanos, who also had connections to Martinez, as late as March 15, 2007 when Castellanos was pulled over while driving an Expedition and hauling $174,000 in cash.[8] Most of that cash was wrapped in green plastic and rubber bands and was stuffed in two bags. Also in the Expedition officers found a briefcase containing a Western Union wire transfer receipt showing that Wynter had sent $700 to someone named Eric Morillo in Panama. That receipt linked Wynter to Castellanos, the Expedition she was driving, and the large amount of cash she was hauling. Based on that evidence, the jury could have reasonably

[8]The Expedition Castellanos was driving was the same vehicle that Martinez used to deliver cocaine on January 2007 as alleged in Count 2 of the indictment, but the license plate had been changed.

14

concluded that Wynter was connected to cash that constituted proceeds from the ongoing drug dealing. See United States v. $242,484.00, 389 F.3d 1149, 1161 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack.").

Following that traffic stop, the Castellanos' home was searched and agents found digital scales, yellow plastic baggies, 38.9 grams of cocaine in an eyeglass case, and what amounted to $30,000 in cash found in various areas in the house. Agents later executed a search of a residence leased by Martin Castellanos in Miramar, where they found 8 kilograms of heroin, a Cadillac with secret compartments that contained $72,000 in cash, packing materials, a heat sealer, and scales. Agents also found two firearms, drug ledgers, and green plastic wrap (the same kind that was used to wrap some of the cash Castellanos was hauling in bags in the Expedition).

Before that search, Martinez had been observed arriving at the Miramar residence and removing a black rolling suitcase from the pick-up truck he was driving. He took the suitcase inside the garage and closed the garage door. He was later observed leaving the Miramar residence with a large black trash bag. Special Agent Smith of the DEA testified that he followed Martinez to a shopping

15

center where Martinez left the trash bag on top of a dumpster. Inside the trash bag Agent Smith found remnants of the rolling suitcase, which had been dismantled "consistent with the use of luggage for the smuggling of contraband." Smith also found kilogram size wrappers that are "used to normally contain narcotics." Thus, the government presented evidence that could have led a reasonable jury to conclude that Martinez was connected to the Miramar house and the drug-trafficking activities going on there, including the 8 kilograms of heroin found there.

As to count 3, which was the conspiracy charge involving heroin trafficking, the government points out that the jury heard testimony from cooperating witness Juan Herrera about Wynter's receipt of multiple kilos of heroin.[9] Herrera trafficked drugs with Wynter from 2001 through 2003. During that time, Herrera received kilo amounts of cocaine and heroin from Wynter. The government asserts that the evidence established that Wynter's future dealings in cocaine and heroin were entirely foreseeable, especially in light of other evidence that Wynter arranged for couriers to drive vehicles to transport drugs and cash and that he specialized in using vehicles with hidden compartments like the Cadillac

---

[9]At the time of trial, Herrera was serving time in prison after pleading guilty to a charge of trafficking 400 to 700 grams of heroin.

found at the Miramar house. According to the government, the evidence showed that Wynter was involved in drug trafficking business across the eastern part of the United States, including New York, New Jersey, South Florida, and Georgia. The government also points out that there was evidence that Wynter, Martin Castellanos, and Martinez all sent money orders to Panama. The jury heard about Wynter's drug trade connection to Panama and the Western Union wire transfer receipt showing that Wynter had sent $700 to someone named Eric Morillo in Panama.

There was plenty of evidence for a reasonable jury to conclude that Wynter was involved in a large-scale, ongoing cocaine and heroin trafficking conspiracy. That evidence established his active participation in the conspiracy through 2005. From 2005 through 2007, there was evidence that Wynter's co-conspirators, William Martinez, Martin Castellanos, and Dulce Castellanos, continued to advance the goals of the conspiracy. There was no evidence that Wynter had withdrawn from the conspiracy before the occurrence of the crimes charged in counts 2 and 3. Despite his failure to withdraw, Wynter contends that the modified Pinkerton instruction in this case violated his due process rights because there was no evidence showing that he was still directly participating in the drug trafficking conspiracy in 2007, and the charged offenses were not reasonably

17

foreseeable consequences of that conspiracy.

Wynter's due process argument conflates two separate kinds of Pinkerton

cases:

> A typical Pinkerton case falls into one of two categories. The first and most common category includes cases in which the substantive crime that is the subject of the Pinkerton charge is also one of the primary goals of the alleged conspiracy. See, e.g., United States v. Luis-Gonzalez, 719 F.2d 1539, 1545 n. 4 (11th Cir.1983) (conspiracy to possess with intent to distribute marijuana; substantive crime of possession of marijuana); United States v. Harris, 713 F.2d 623, 626 (11th Cir.1983) (conspiracy to distribute cocaine; substantive crimes of possession and distribution of cocaine); United States v. Tilton, 610 F.2d 302, 309 (5th Cir.1980) (conspiracy to commit mail fraud; substantive crime of mail fraud).

> The second category includes cases in which the substantive crime is not a primary goal of the alleged conspiracy, but directly facilitates the achievement of one of the primary goals. See, e.g., Shockley v. United States, 166 F.2d 704, 715 (9th Cir.) (conspiracy to escape by violent means from federal penitentiary; substantive crime of first degree murder of prison guard), cert. denied, 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773 (1948); United States v. Brant, 448 F. Supp. 781, 782 (W.D.Pa.1978) (narcotics conspiracy; substantive crime of possession of a firearm during commission of a felony).

> In either of these two categories, Pinkerton liability can be imposed on all conspirators because the substantive crime is squarely within the intended scope of the conspiracy.

Alvarez, 755 F.2d at 850 n.24.  The present case falls in the first category

(conspiracy to possess with intent to distribute cocaine and heroin; substantive

crimes of possession with intent to distribute cocaine and heroin).  The potential

18

due process problem mentioned in <u>Alvarez</u>, <u>id.</u> at 850 ("Furthermore, we are mindful of the potential due process limitations on the <u>Pinkerton</u> doctrine in cases involving attenuated relationships between the conspirator and the substantive crime."), refers to the second kind of <u>Pinkerton</u> case in which a co-conspirator commits a reasonably foreseeable but originally unintended substantive crime (e.g., murder in a drug case) and minor participants in the conspiracy argue that they are not liable for that crime because their relationship to it is attenuated. <u>See</u> <u>id.</u>

For example, in the <u>Alvarez</u> case three defendants were held liable for the murder of a DEA agent in the course of a drug conspiracy because all three of them were more than minor participants in that conspiracy, and they all had "actual knowledge of at least some of the circumstances and events leading up to the murder." <u>Id.</u> at 851. This Court reasoned that "the relationship between the three appellants and the murder was not so attenuated as to run afoul of the potential due process limitations on the <u>Pinkerton</u> doctrine." <u>Id.</u>

Wynter argues that he is not liable for his co-conspirators' continued drug trafficking because their acts in 2007 were too attenuated from his acts from 1997 to 2005, and for that reason that jury should not have been given a <u>Pinkerton</u> charge. In the jury charge conference, the district court stated that Wynter was

19

responsible for what happened as part of the conspiracy, regardless of whether it occurred at the beginning or the end of it.

Wynter's attenuation and due process argument applies, at best, to Pinkerton cases in which the substantive crime (e.g., murder) is the unintended but foreseeable consequence of the intended scope of the conspiracy (e.g., drug trafficking). See Alvarez, 755 F.2d at 850 n.24. Here, the substantive crimes were possession with the intent to distribute cocaine and heroin and the conspiracy was trafficking in cocaine and heroin. The government had to show that Wynter was a member of the conspiracy, which it did by showing his drug trafficking connections with Martinez and Castellanos. Because Wynter did not establish as a defense that he had affirmatively withdrawn from the conspiracy, drug deals in which Martinez was involved toward the end of the conspiracy continued to subject Wynter to liability for drug trafficking, even if Wynter did not directly participate in those drug deals. See id. at 849–50. It was reasonably foreseeable that members of a drug trafficking conspiracy would continue to traffic in drugs unless evidence showed that the conspiracy had ended and that the drug trafficking in 2007, which was charged in the indictment, was some new conspiracy with which Wynter had no connection. It did not.

The government presented evidence of Wynter's drug dealing connections

20

with Martinez and evidence that Martinez was involved in the drug deals charged in counts 2 and 3 of the indictment. The district court gave an instruction on multiple conspiracies and separate conspiracies. It also gave a modified Pinkerton instruction that required additional proof by the government that the substantive offense was "within the scope of the agreement" between Wynter and Martinez. And the district court instructed the jury on the statute of limitations for the crime of conspiracy.

At most, Wynter made some showing that he had stopped being actively involved in the conspiracy in 2005. He failed to present any evidence that he took affirmative steps to withdraw from the conspiracy, see Westry, 524 F.3d at 1216–17, and "mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." Id. at 1217 (quoting Finestone, 816 F.2d at 589 (quotation marks omitted)). Because he did not withdraw from the conspiracy, Wynter continued to be liable for the acts of his co-conspirators until the last overt act of the conspiracy was completed, even if that final act was performed in 2007 by one of his co-conspirators instead of by him. See Finestone, 816 F.2d at 589. We are not "left with a substantial, ineradicable doubt as to whether the jury was properly guided in its deliberations" on counts 2 and 3 based on the district court's modified Pinkerton instruction. Dohan, 508 F.3d at 993. The district court did not

21

err by giving that instruction, and the instruction did not violate Wynter's due process rights.

III.

Wynter also contends that the government presented insufficient evidence to prove that his co-conspirator Martinez possessed cocaine with the intent to distribute it as charged in count 2 of the indictment. Wynter argues that he cannot be held liable for that offense because there was not enough evidence to prove that Martinez committed it. Count 2 alleged that on January 23, 2007, Wynter and Martinez possessed at least five kilograms of cocaine with the intent to distribute it. Wynter asserts that the government's evidence on that count was limited to the following: (1) Martinez carried a gym bag into Neal Monroe's apartment; (2) Martinez left that apartment without the gym bag; (3) when the apartment was searched the gym bag was discovered.

"We review the sufficiency of the evidence <u>de novo</u>, viewing the evidence in the light most favorable to the verdict." <u>United States v. Thompson</u>, 473 F.3d 1137, 1142 (11th Cir. 2006). "The jury gets to make any credibility choices, and we will assume that they made them all in the way that supports the verdict." <u>Id.</u> Furthermore, "the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt." <u>Id.</u>

The jury heard testimony from Special Agent Smith of the DEA, who had followed Martinez to Monroe's apartment complex during a surveillance operation. Smith testified about seeing Martinez arrive at the apartment complex carrying a blue and gray duffle bag, seeing him leave without the bag, and then finding the empty bag during a search of Monroe's apartment. He testified about hearing running water coming from the apartment. Later Smith saw Monroe in the hallway of the apartment; Smith observed that Monroe's eyes were wide and bloodshot, and there was white powder on his face. A search of the apartment revealed a digital scale and cocaine that had been put down the drain of the bathtub as well as packaging materials inside of the bathtub. Those packaging materials later tested positive for cocaine. Monroe did not testify at trial and no trace amounts of cocaine where found in the blue and gray duffle bag that Martinez had left at the apartment.[10]

---

[10]During a pre-trial hearing on Dulce Castellanos' motion to suppress, Special Agent Smith also testified that while Monroe was in custody, he told the agents that Martinez had delivered 4 kilograms of cocaine to him that day. According to Smith, 6 to 8 kilograms of cocaine had been destroyed in Monroe's apartment. Smith testified that Monroe told agents that he had known Martinez for years and for the last six months had been buying 5 to 6 kilograms of cocaine from him every 10 days. The agents got Martinez's and Wynter's phone numbers from Monroe's cell phone. Monroe described an older Latin man who would deliver cocaine or pick up money for Martinez, and that man was later identified as Martin Castellanos. Monroe agreed to cooperate further and was not arrested. Because Agent Smith gave that testimony at the suppression hearing instead of at trial, however, it was not considered by the jury.

Special Agent Bradley also testified at the suppression hearing. He testified about a

If that evidence were considered in isolation, it would be a slender reed on which to hang a conviction on count 2. However, Agent Smith's testimony coupled with a significant amount of additional evidence regarding Martinez's involvement in trafficking cocaine leads us to conclude that a jury reasonably could have found guilt beyond a reasonable doubt on count 2. As we explained in section II of this opinion, the jury heard testimony from Santana and James about the drug dealing connections between Martinez and Wynter. See supra at 10–13. The jury also heard from Herrera that Martinez was Wynter's "partner" and that Herrera had given $80,000 in cash to Martinez. The jury heard testimony specifically about Martinez's involvement in drug trafficking activities. In light of all of that evidence, the jury could have reasonably chosen to credit the testimony of Agent Smith and find that Martinez delivered cocaine to Monroe on January 23, 2007, as charged in count 2 of the indictment.

**AFFIRMED.**

---

cooperating source who picked up $95,000 from Martinez. A check of the tag on the vehicle Martinez was driving when he delivered the money showed traffic citations issued to Martinez and to Wynter.