[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 9, 2012
JOHN LEY
CLERK

No. 11-10988
Non-Argument Calendar

_____

D.C. Docket No. 1:10-cr-20277-CMA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MAURICE DANIELS,
a.k.a. Reece,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 9, 2012)

Before HULL, PRYOR and BLACK, Circuit Judges.

PER CURIAM:

Maurice Daniels challenges his convictions on two counts of conspiring to commit robbery, 18 U.S.C. § 1951(a), two counts of robbery, id., and two counts of possessing a firearm in furtherance of a crime of violence, id. § 924(c)(1)(A). Daniels argues that the district court erred by admitting a photographic lineup and by permitting Erskaneshia Ritchie and Nikkia Thomas to repeat statements made by Daniels's coconspirators. Daniels also argues that the government failed to prove that the robberies affected interstate commerce. We affirm.

The district court did not clearly err when it found that the third photographic lineup shown to a victim, Carlos Fagundo, was not impermissibly suggestive. The photographic lineup contained "mug shots" of six African-American men with similar hairstyles, facial expressions, and clothing. That Daniels is the only man without a mustache is not conspicuous because the other five mens' mustaches vary in thickness and prominence and because all six men in the photographic lineup have a closely-trimmed beard. See Cikora v. Dugger, 840 F.2d 893, 897 (11th Cir. 1988). Neither Daniels's lighter complexion, which appears attributable to lighting, nor the position of his photograph in the array makes the photographic lineup suggestive because all six men share "'roughly the same characteristics and features.'" Id. (quoting Williams v. Weldon, 826 F.2d

2

1018, 1021 (11th Cir. 1987)).  Fagundo identified Daniels in a third photographic lineup after Fagundo had been unable to identify a robber in two lineups that did not include a photograph of Daniels, and Fagundo testified at trial that he was not given any "hints or clues" from the officers who showed him the lineup.

The district court also did not abuse its discretion by allowing Ritchie and Thomas to testify about incriminating statements made by Daniels's coconspirators about their roles in robbing armored car guards inside Westland Mall and Sawgrass Mall.  Daniels moved in limine to exclude the testimonies of Ritchie and Thomas about several statements made by Carter and Maxime, and Daniels challenges four of those statements on appeal.  Three of those four statements challenged by Daniels were admissible as statements against penal interest, Fed. R. Evid. 804(b)(3), and the fourth statement was admissible as a prior consistent statement, id. 801(d)(1)(B).

Ritchie could testify about the statement of her boyfriend, Dwight Carter, that "yeah, if I would have turned a certain way, [I] would have been hit" because the statement established that Carter participated in the Westland robbery.  Carter's statement was against his penal interest, Carter was unavailable to testify, and other corroborating evidence established that Ritchie's testimony was trustworthy.  See United States v. US Infrastructure, Inc., 576 F.3d 1195, 1208–09

3

(11th Cir. 2009). Ritchie's testimony was consistent with the testimony of the guard that he shot at the robbers inside the Westland Mall and with a recording of the robbery by a surveillance camera inside the shopping mall.

Ritchie also could testify about her telephone conversation with Carter immediately following the Sawgrass robbery in which Carter said that Daniels, Maxime, and another cohort had robbed the guard. During the conversation, Carter asked Ritchie to report a false emergency that would excuse Carter from work so he could help his coconspirators divide the stolen money, but Ritchie instructed Carter to remain at work to avoid implicating himself as the lookout for the robbery. The district court admitted Ritchie's testimony on the ground that she was a coconspirator in the Sawgrass robbery. See Fed. R. Evid. 801(d)(2)(E). Even if the district court abused its discretion when it admitted Ritchie's testimony under Rule 804(d)(2)(E), we "may review the evidence to determine whether the evidence was admissible pursuant to Rule 804(b)(3) even if the district court did not consider the applicability of Rule 804(b)(3)." US Infrastructure, 576 F.3d at 1209. Carter's statements were against his penal interest and Carter was unavailable to testify. Moreover, Ritchie's testimony was trustworthy because Carter's statements were consistent with Thomas's testimony about the Sawgrass robbery; a surveillance video that showed Carter working near the scene of the

robbery and Daniels stealing the money bag; and Fagundo's identification of Daniels as one of the robbers. "[T]he mere fact that [Ritchie] was a confidante of [Carter] does not rule out admissibility of [his] statement as against [his] interest." United States v. Westry, 524 F.3d 1198, 1215 (11th Cir. 2008).

Thomas could testify about the statement of her boyfriend, Emmanuel Maxime, that he had driven the first vehicle in which Daniels and Carter fled from the Westland robbery. Maxime's statement was against his penal interest, he was unavailable to testify, and corroborating evidence established that his statement was trustworthy. Thomas's testimony was consistent with the testimony of the guard at Westland Mall and the video recording of the robbery.

Thomas also could testify about statements made by Ritchie about the Westland robbery. Ritchie's statements were admissible as a prior consistent statement to rebut defense counsel's suggestion while cross-examining Ritchie that she had implicated Daniels to obtain a reduction of her sentence. See United States v. Ettinger, 344 F.3d 1149, 1160–61 (11th Cir. 2003). Ritchie's statements were made before her arrest and before she was concerned about her sentence for the robbery. Ritchie's statements also were consistent with her trial testimony that she watched for the guard to arrive at Westland Mall and drove another getaway vehicle used by Carter, Maxime, and Daniels. Daniels argues that it was

5

"inappropriate" for the government to seek to introduce Ritchie's statement after she had been excused, but Daniels did not move to recall Ritchie as a witness and it does not appear that "such a recall would have been helpful," United States v. Weeks, 716 F.2d 830, 833 (11th Cir. 1983), in the light of Daniels's extensive cross-examination of Ritchie.

Daniels's argument about cumulative error also fails. See United States v. Gamory, 635 F.3d 480, 497 (11th Cir. 2011). Daniels's argument is predicated on the notion that the district court erroneously admitted two or more of the statements of his cohorts. No error occurred.

The government presented ample evidence to establish that Daniels's robberies affected interstate commerce. To convict a defendant for violating the Hobbs Act, the government must prove that the defendant committed a robbery that "in any way or degree" obstructed, delayed, or affected commerce or the movement of any article or commodity in commerce. 18 U.S.C. § 1951(a). The robbery of Fagundo, a guard for AT Systems, depleted the assets of AT Systems. See United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir. 2000); United States v. Diaz, 248 F.3d 1065, 1085 (11th Cir. 2001). Fagundo testified that he collected money from a few stores in Sawgrass Mall, and an employee of AT Systems testified that the company lost more than $70,000 when it mailed three

6

reimbursement checks from its office in Delaware to store offices in New Jersey and California. The robbery of Joseph Eliassin, a guard for Dunbar Armored, both depleted the assets of Dunbar and caused a "cumulative impact on interstate commerce." Diaz, 248 F.3d at 1085; Rodriguez, 218 F.3d at 1244. Testimony from Eliassin, an employee of the Victoria's Secret store in Westland Mall, and a regional vice-president of Dunbar established that the robbers stole about $58,000 that Eliassin had collected from Victoria's Secret, after which the store had to close for several hours and had been denied shipments of goods because of decreased sales, and that Dunbar had to mail from its headquarters in Maryland a check for more than $63,000 to the headquarters of Victoria's Secret in Ohio. Daniels argues that the prosecutor's depletion of assets theory "runs afoul of principles of federalism" that we discussed in Florida ex rel. Attorney General v. U.S. Department of Health & Human Services, 648 F.3d 1235 (11th Cir. 2011), but that decision has no bearing on Daniels's convictions under the Hobbs Act.

Daniels's convictions are **AFFIRMED**.